# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 7, 2019**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | **CRIMINAL NO.** |
| ) | |
| v. ) | **VIOLATIONS:** |
| ) | |
| **EGHBAL SAFFARINIA** ) | Count 1:  18 U.S.C. §§ 1001(a)(1) and 2 |
| (a/k/a "EDDIE SAFFARINIA"), ) | (Concealment of Material Facts) |
| ) | |
| Defendant. ) | Counts 2-4:  18 U.S.C. § 1001(a)(2) & 2 |
| ) | (False Statements) |
| ) | |
| ) | Counts 5-7:  18 U.S.C. § 1519 and 2 |
| ) | (Falsification of a Record or Document) |

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At times material to this Indictment:

1. The United States Department of Housing and Urban Development ("HUD") was a department within the Executive Branch of the United States government.

2. HUD's Office of Inspector General ("HUD-OIG") was a component within HUD that was located in the District of Columbia and was responsible for protecting programs administered by HUD.  HUD-OIG's primary mission was to prevent waste, fraud, abuse, and mismanagement by HUD's customers, employees, contractors, and other vendors associated with the housing industry.  HUD-OIG conducted audits and investigations to identify internal and external problems, recover funds and tax dollars associated with HUD's programs, and prevent fraud.

3.      Defendant EGHBAL SAFFARINIA (a/k/a "EDDIE SAFFARINIA") was employed by HUD-OIG from in or about February 2012 until in or about September 2017. SAFFARINIA served as the Assistant Inspector General for Information Technology ("IT") and, later, as the Assistant Inspector General for Management and Technology. SAFFARINIA oversaw HUD-OIG's Office of Management and Technology, and, after a reorganization, HUD-OIG's Office of Information Technology. SAFFARINIA was a member of the Senior Executive Service ("SES"). SAFFARINIA also served as HUD-OIG's Head of Contracting Activity.

4.      As a member of the SES, SAFFARINIA had a legal duty to file an annual public financial disclosure report pursuant to the Ethics in Government Act of 1978, 5 U.S.C. §§ 101, *et seq.* His disclosures were made on an Office of Government Ethics ("OGE") Form 278. The purpose of the OGE Form 278 was to: (a) foster transparency, trust, and confidence in the integrity and decision-making of the Executive Branch; and (b) assist employees and their agencies in avoiding actual or apparent conflicts of interest between official duties and private financial interests or affiliations. Filers were required to disclose, among other things, their assets and income, transactions, liabilities, gifts and travel reimbursements, and arrangements and agreements. As to liabilities, filers were required to report liabilities over $10,000 owed to any one creditor at a time during the reporting period. The examples of required disclosures listed on the form included the existence and amount of a promissory note.

5.      As HUD-OIG's Head of Contracting Activity, and as a senior manager supervising HUD-OIG procurements, SAFFARINIA oversaw procurement review and approval processes, including IT contracts; had access to contractor proposal information and source selection information; and participated personally and substantially in IT procurements. He therefore had a legal duty under governing regulations to disclose actual and potential conflicts

of interest and to not solicit and accept anything of monetary value, including loans, from anyone who (a) has or is seeking to obtain government business from HUD-OIG, (b) conducts activities that are regulated by HUD-OIG, and (c) has interests that may be substantially affected by the performance or nonperformance of SAFFARINIA's official duties.

6. Person A was co-founder and chief executive officer of Company A, an IT solutions provider and government contractor located in Virginia.

7. Person B was a HUD-OIG employee who was hired by SAFFARINIA in or about August 2012 to head HUD-OIG's new predictive analytics department ("PAD"). SAFFARINIA oversaw PAD and Person B.

8. Companies B and C were IT firms and government contractors located in Virginia and the District of Columbia, respectively.

9. SAFFARINIA, Person A, and Person B were friends who emigrated from the same country, went to college together in the early 1980s, and socialized with each other on a regular basis. SAFFARINIA and Person B also co-owned an information technology ("IT") business in the late 1990s, and SAFFARINIA and Person A had a long-standing financial relationship.

## COUNT 1
## CONCEALMENT OF MATERIAL FACTS
### (Violation of 18 U.S.C. §§ 1001(a)(1) and 2)

10. The allegations set forth in paragraphs 1-9 are realleged and incorporated by reference as though fully set forth herein.

11. Beginning no later than in or about early 2012, and continuing thereafter until at least in or about mid-2016, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the Executive Branch of the Government of the United States, the defendant,

EGHBAL SAFFARINIA (a/k/a "EDDIE SAFFARINIA"), did knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device material facts—that is, (a) the nature and extent of SAFFARINIA's financial relationship with Person A, including payments from Person A to SAFFARINIA totaling at least $80,000; (b) SAFFARINIA's unauthorized disclosure of confidential government information to Person A; and (c) SAFFARINIA's efforts to steer government contracts to Person A and Company A—by violating his legal duty to disclose a financial relationship with Person A, including on his annual OGE Forms 278.

## Purpose of the Scheme

12.     It was a purpose of the scheme for SAFFARINIA to:  (a) conceal from HUD-OIG, OGE, and the public that he had a financial relationship with Person A that included tens of thousands of dollars in payments from Person A and an outstanding $80,000 promissory note on which payment was owed to Person A, and, thus, an actual and apparent conflict of interest in overseeing government business in which Person A and Company A had a significant financial interest; and (b) use his official position at HUD-OIG to benefit and enrich Person A and Company A by steering government business and disclosing confidential government information to Person A and Company A during a period when SAFFARINIA had a financial relationship with Person A.

## Manner and Means of the Scheme

The scheme was executed through the following manner and means, among others:

13.     Between in or about May 2012 and in or about April 2016, SAFFARINIA, on an annual basis, submitted and caused to be submitted an OGE Form 278 to HUD-OIG and OGE. SAFFARINIA's OGE Forms 278 falsely stated and certified that, during their respective reporting periods, SAFFARINIA had no reportable liabilities (other than credit card debt

reported by SAFFARINIA in 2016) when, as SAFFARINIA well knew, he was receiving substantial payments and loans from Person A. SAFFARINIA also did not disclose his financial relationship with Person A on any other portion of his OGE Forms 278.

14. During the period when SAFFARINIA was receiving payments and loans from Person A, SAFFARINIA steered significant government business to Company A and its business partners, he disclosed confidential and internal government information to Person A, he gave competitive advantages and preferential treatment to Person A and Company A, and he caused and attempted to cause HUD-OIG to increase the amount of work and hours awarded to Person A and Company A.

15. To conceal his distribution of confidential and internal government information to Person A, SAFFARINA used his personal e-mail account to communicate with Person A.

16. SAFFARINIA misrepresented to and concealed from his supervisors the nature of his relationship with Person A by, among other things, failing to disclose his financial relationship with Person A, falsely minimizing the nature of his personal relationship with Person A, and failing to disclose his efforts to steer lucrative governmental business to Person A and Company A. SAFFARINIA also did not disclose his financial relationship with Person A to other contracting officials and agency ethics officials and counsel.

**Execution of the Scheme**

17. In furtherance of the scheme, and to accomplish its purposes, SAFFARINIA and others known and unknown to the grand jury, committed or caused the following acts, among others, in the District of Columbia and elsewhere:

**A.    SAFFARINIA Caused Company B to Retain Person A and Company A as a Subcontractor on HUD-OIG's IT Services Contract**

18.    In or about 2012, SAFFARINIA caused Company B to enter into a business partnership with Person A and Company A so that Company A could serve as one of Company B's subcontractors on a multi-year, $30 million IT services contract for HUD-OIG (the "IT services contract"). Company A received approximately $1,065,520.36 for work performed on the IT services contract from in or about December 2012 through in or about September 2015.

19.    In or about May 2011, HUD-OIG awarded a one-year contract to Company B to complete an existing IT services contract. After the request for proposal ("RFP") was issued on or about December 16, 2011, Company B submitted a bid proposal in or about early 2012. A technical evaluation panel selected Company B over two other bidders.

20.    Between in or about January 2012 and in or about February 2012, during a period when Person A was seeking additional work and SAFFARINIA was transitioning to his new position with HUD-OIG, SAFFARINIA and Person A met for lunches and communicated with each other about business opportunities for Person A and Company A.

21.    On or about February 21, 2012, in connection with the IT services contract, SAFFARINIA received and was asked to sign a "Conflict of Interest Acknowledgement and Nondisclosure Agreement" from GSA's contracting officer. The agreement required SAFFARINIA to disclose actual and apparent conflicts of interest and to safeguard and use procurement information appropriately. SAFFARINIA did not sign the form.

22.    On or about April 25, 2012, after SAFFARINIA learned that a key consultant (a subject matter expert) on Company B's contract had resigned, SAFFARINIA instructed a staff member to inform Company B that the position should not be filled.

23. On or about April 27, 2012, SAFFARINIA canceled the pending RFP. SAFFARINIA then sent an e-mail to a supervisor explaining that a "key person" at Company B had resigned and he was unable to leave the position unfilled with the way the contract was written. SAFFARINIA used the departure of Company B's consultant as an opportunity to insert Person A into the vacant role.

24. On or about May 11, 2012, at or near the time of an in-person meeting with Company B's representatives, SAFFARINIA recommended to Company B that it hire Person A and Company A for a portion of the IT services contract. Company B's representatives had never heard of Person A or Company A, and SAFFARINIA did not disclose to Company B that he had a personal and financial relationship with Person A. Based on SAFFARINIA's statement, Company B's representatives realized they should hire Person A and Company A as a subcontractor if Company B wanted to retain the IT services contract with HUD-OIG.

25. Between in or about May 2012 and in or about June 2012, while Person A was meeting with Company B's representatives and negotiating a business partnership, SAFFARINIA and Person A continued to meet and communicate with each other regularly.

26. On or about June 21, 2012, after SAFFARINIA requested a copy of HUD-OIG's draft Performance Work Statement for the IT services contract and SAFFARINIA and Person A met for lunch, SAFFARINIA forwarded the document to his personal e-mail account and then forwarded the document to Person A's private e-mail account.

27. On or about July 12, 2012, after SAFFARINIA and Person A spoke on the telephone several times and had scheduled a lunch meeting for the same day, SAFFARINIA forwarded internal HUD-OIG e-mails and a revised copy of the Performance Work Statement for the IT contract to his personal e-mail account.

28.     In or about late July or early August 2012, Company C (a subcontractor on Company B's IT services contract at the time) learned that: (a) Person A and Company A had been added as a subcontractor; (b) SAFFARINIA strongly encouraged Company B to form a business relationship with Person A and Company A, leaving Company B no choice; and (c) Company C would lose money and subcontractor positions because some of Company C's positions would be reallocated to Company A.

29.     On or about August 3, 2012, at SAFFARINIA's direction, HUD-OIG and the GSA issued a revised RFP, which contained an amended Statement of Work.

30.     On or about August 6, 2012, SAFFARINIA scheduled a lunch with Person A for August 9, 2012. After the scheduled lunch meeting, Person A, on or about August 14, 2012, provided feedback to Company B about its bid proposal.

31.     On or about August 17, 2012, Company B submitted a revised bid proposal that included Company A as a subcontractor and Person A as a subject matter expert.

32.     On or about September 21, 2012, HUD-OIG and GSA awarded the $30 million IT services contract to Company B. The IT services contract had a one-year base period and six option years. SAFFARINIA forwarded the award document and GSA's e-mail to Company B to his personal e-mail account and then sent it to Person A saying, "Congratulations!" Person A replied, "Many thanks! I could not be more excited. Please let me know when might be a good time to touch base." SAFFARINIA then scheduled a dinner with Person A on or about September 24, 2012.

33.     Between on or about September 24, 2012 and on or about December 5, 2012, SAFFARINIA and Person A scheduled lunches and dinners with each other as Company B

communicated with SAFFARINIA about a roadmap for implementing the IT services contract and integrating Person A.

34.     Between in or about December 2012 and in or about March 2013, after Person A started working at HUD-OIG and after Company B's project manager asked Person A to assist with selecting staff for the IT services contract, Person A sent a series of e-mails to SAFFARINIA's personal e-mail account so that SAFFARINIA could pre-screen the candidates and discuss their qualifications with Person A.

35.     On or about March 5, 2013, Person A sent an e-mail to SAFFARINIA's personal e-mail account proposing a way for SAFFARINIA to review resumes submitted to Company B so that he could clear them in advance.  SAFFARINIA stated, "But of course! . . . and that is the reason why they call you [Person A] and me Eghbal."  Person A replied, "And I will always be under your shadow. . . ."  SAFFARINIA answered, "You have control, you are our big!"

36.     Between in or about December 2012 and in or about September 2015, Company A received approximately $1,065,520 for subcontractor work performed under the IT services contract.

**B.      SAFFARINIA Received $80,000 from Person A**

37.     On or about June 25, 2013, Person A provided a $15,000 check to SAFFARINIA, which SAFFARINIA's spouse deposited.

38.     On or about July 3, 2013, after several telephone calls with Person A, SAFFARINIA sent an e-mail from his personal e-mail account to Person A with a picture of the bank deposit receipt for the $15,000 check.

39.     On or about the dates listed below, Person A provided personal checks to SAFFARINIA in the following amounts:

| DATE | AMOUNT |
|---|---|
| 07/02/2013 | $10,000 |
| 07/08/2013 | $8,000 |
| 07/15/2013 | $7,000 |
| 09/04/2013 | $7,000 |
| 09/18/2013 | $15,000 |
| 09/20/2013 | $15,000 |
| 10/20/2013 | $9,000 |
| 11/15/2013 | $9,000 |

40. On or about September 20, 2013, SAFFARINIA and Person A signed a promissory note, witnessed by their spouses, pursuant to which Person A agreed to loan $80,000 to SAFFARINIA.

41. Between in or about November 2013 and in or about April 2014, SAFFARINIA, using his personal e-mail account, forwarded information to Person A from SAFFARINIA's relatives. The information suggested that SAFFARINIA's relatives used a foreign bank account to transfer funds, totaling an amount substantially less than $80,000, to a foreign bank account maintained by Person A's relatives. SAFFARINIA made no contemporaneous repayments on the $80,000 in the United States.

C. **SAFFARINIA Increased Person A's Work Hours on Two Occasions**

42. Between in or about October 2013 and in or about late December 2013, SAFFARINIA caused subordinates to modify Company B's IT services contract to increase Person A's allotted hours as a subcontractor. The modification obligated another $78,000 for Person A, which allowed Person A to work full-time.

43. On or about December 4, 2013, SAFFARINIA forwarded an e-mail chain to his personal e-mail account and then sent it to Person A's private e-mail account. The e-mail chain reflected internal discussions about obtaining additional funding for Person A.

44.     On or about December 6, 2013, when Person A attended a large meeting that included SAFFARINIA and his supervisors, SAFFARINIA misrepresented to his supervisors the nature of his relationship with Person A and Person A's role on Company B's IT services contract.  SAFFARINIA's supervisors directed SAFFARINIA to remove Person A as a government contractor as soon as Person A finished an existing project.  SAFFARINIA ignored the directive.

45.     On or about June 3, 2014, after Person A forwarded an e-mail chain to SAFFARINIA concerning Person A's allotted work hours, SAFFARINIA sent a follow-up e-mail to a subordinate.  SAFFARINIA thereafter forwarded his e-mails with the subordinate to his personal e-mail account and then sent them to Person A's private e-mail account.

46.     On or about June 13, 2014, SAFFARINIA forwarded an e-mail regarding an agreement for ad hoc funding for Person A's position to his personal e-mail account and then sent it to Person A's private e-mail account.

D.  **SAFFARINIA Caused HUD-OIG to Recompete the IT Services Contract, and He Caused Company C to Form a Business Partnership with Person A and Company A for the Recompete Contract**

47.     Between in or about late 2013 and in or about mid-2014, SAFFARINIA caused HUD-OIG to recompete the IT service contract (the "recompete contract") at least in part to award the contract to Person A and Company A, and he caused Company C to enter into a business partnership with Company A so that Company A could submit a joint bid for recompete contract.  The recompete contract, which was awarded to Company C, was worth approximately $17.83 million, of which Company A, as a subcontractor for Company C, was expected to receive approximately $9 million.

48.     On or about September 4, 2013, after a scheduled dinner meeting with Person A and at or near the time that SAFFARINIA decided to recompete the IT services contract,

SAFFARINIA instructed a subordinate to send a late night e-mail to Company B, criticizing Company B's performance. SAFFARINIA complimented the subordinate on the e-mail and forwarded the e-mail to a supervisor.

49. Between in or about September 2013 and in or about November 2013, SAFFARINIA told a subordinate that he wanted to recompete the contract at least in part to award the contract to Person A and Company A.

50. Between in or about November 2013 and in or about early December 2013, SAFFARINIA directed a subordinate to meet with Person A and the owner of Company C, separately and together, to cause them to enter into a business partnership and bid against Company B for the recompete contract.

51. In or about early 2014, when Person A and Company C's owner met to discuss a business partnership for the recompete contract, Person A misrepresented the nature of Person A's relationship with SAFFARINIA and Person A's role with HUD-OIG.

52. Between in or about late December 2013 and in or about May 2014, as Person A and Company C's representative met, communicated, and negotiated their business partnership, SAFFARINIA and Person A met and communicated with each other.

53. In or about February 2014, when negotiations between Person A and Company C's owner stalled over revenue sharing, SAFFARINIA and Person A met for lunch. SAFFARINIA then relayed Person A's frustrations and concerns to a subordinate. Later that day, SAFFARINIA's subordinate scheduled a meeting with Company C's owner, which occurred on or about February 24, 2014. At the meeting, the subordinate encouraged Company C to resume negotiations with Person A.

54. On or about March 12, 2014, SAFFARINIA's subordinate arranged a lunch meeting with Person A and Company C's owner. During the meeting, SAFFARINIA's subordinate encouraged Person A and Company C's owner to enter into a business partnership for the recompete contract.

55. On or about March 21, 2014, SAFFARINIA met with his subordinate, who advised SAFFARINIA that Person A and Company C were resuming their business partnership negotiations.

56. On or about May 9, 2014, after SAFFARINIA asked a subordinate to send him the final (but not publicly available) version of the RFP for the recompete contract, SAFFARINIA and Person A spoke on the telephone. SAFFARINIA then forwarded the RFP to his personal e-mail account and used his personal e-mail account to send the RFP to Person A's private e-mail account.

57. On or about May 14, 2014, SAFFARINIA received an e-mail from his subordinate informing him that the RFP was about to be posted publicly. SAFFARINIA forwarded the e-mail to his personal e-mail account and then sent it to Person A's private e-mail account. Person A and Company C's owner finalized their business partnership on the same day and executed a partnership agreement on or about May 15, 2014.

58. On or about May 15, 2014, SAFFARINIA, a subordinate, Person B, and two others friends that SAFFARINIA had recently hired went to lunch. At or about the same time, SAFFARINIA instructed the contracting officer to select Person B and the two recent hires to serve on the technical evaluation panel for the recompete contract. The contracting official formally announced the technical evaluation panel on or about May 21, 2014.

59.     On or about July 1, 2014, pursuant to SAFFARINIA's request, the contracting official provided bid price estimates for the recompete contract to SAFFARINIA.  A few hours later, SAFFARINIA asked Person B to lunch.

60.     On or about September 26, 2014, after SAFFARINIA and Person A met for a pre-scheduled lunch for that same day, and after Company B filed and lost a bid protest, HUD-OIG notified Company C that it had been awarded the recompete contract.  SAFFARINIA forwarded the e-mail (with the contract documents) to his personal e-mail account and then sent the e-mail to Person A's private e-mail account.

**E.      SAFFARINIA Gave Competitive Advantages to Person A for the BIDS Contract**

61.     Between in or about late 2013 and in or about August 2014, SAFFARINIA gave competitive advantages to Person A and Company A in the awarding of a small software contract, the Business Intelligence Dashboard Solutions ("BIDS") contract, during a period when Person A assisted HUD-OIG in drafting the procurement documents.

62.     In or about 2013, SAFFARINIA directed Person B to research, evaluate, negotiate, and acquire analytical software products, dashboard programs, and related tools to assist PAD.

63.     To assist Person B with the evaluation process, SAFFARINIA, between in or about mid-October 2013 and in or about December 2013, caused subordinates to:  (a) task Person A with reviewing and evaluating software products for PAD; (b) reassign Person A to PAD on a full-time basis; and (c) move PAD (along with Person A) to HUD-OIG's headquarters.  After the reassignment, Person A reported to Person B, and Company B had less interaction and oversight of Person A.

64.     On or about January 14, 2014, Person A communicated with a software company representative regarding the BIDS contract. Person A thereafter negotiated a business partnership with the software company wherein Company A would serve as the prime contractor on the software company's potential bid proposal. Person A instructed the software company representative to use Person A's private e-mail account.

65.     In or about May 2014, SAFFARINIA directed a subordinate to task Person A with drafting the solicitation documents for the BIDS contract.

66.     Between in or about May 2014 and in or about June 2014, Person A and Person B circulated multiple drafts of the Statement of Work and Performance Work Statement for the BIDS contract, including through personal and private e-mail accounts.

67.     In or about mid-2014, SAFFARINIA directed HUD-OIG's contracting official to assign Person B as the sole member of the technical evaluation panel for the BIDS contract.

68.     On or about June 9, 2014, the contracting official circulated a chain e-mail to SAFFARINIA, Person B, and others, attaching the Statement of Work for the BIDS contract.

69.     On or about June 12, 2014, Person A sent an e-mail to Person B with price estimates for HUD-OIG's internal price estimate justification. Person A's estimates included prices for products offered by the two software companies with which Person A was negotiating reseller agreements. SAFFARINIA and Person A spoke on the telephone approximately an hour later.

70.     Between in or about June 2014 and in or about July 2014, Person A and Person B met with the contracting official and disclosed that Company A would submit a proposal on the BIDS contract. Person A and Person B did not disclose to the contracting official that Person A had worked on the Statement of Work and therefore had an organizational conflict of interest and

an unfair advantage over competing bidders. SAFFARINIA also did not disclose Person A's role in drafting the Statement of Work for the BIDS contract, for which Company A subsequently submitted a bid.

71. Between on or about June 18, 2014 and on or about June 24, 2014, Person A signed a reseller's agreement with one of the software companies and drafted and submitted Company A's bid proposal for the BIDS contract.

72. On or about August 4, 2014, after SAFFARINIA directed the contracting officer to assign Person B as the sole member of the technical evaluation panel for the BIDS contract, Person B rejected 13 other bid proposals and HUD-OIG awarded the BIDS contract to Person A and Company A.

73. Between in or about September 2014 and in or about July 2016, Company A received approximately $277,738.88 for work on the BIDS contract.

(In violation of 18 U.S.C. §§ 1001(a)(1) and 2)


## COUNTS 2-4
## FALSE STATEMENTS
## (Violation of 18 U.S.C. §§ 1001(a)(2) and 2)

74.     The allegations set forth in paragraphs 1 through 73 are realleged and incorporated by reference as though fully set forth herein.

75.     In addition to the promissory note executed with Person A, SAFFARINIA received $90,000 in loans from his neighbor pursuant to a promissory note executed on or about March 24, 2015.  SAFFARINIA did not disclose the payments from Person A or his neighbor to his supervisors, agency ethics officials or counsel, or on his public financial disclosure forms.

76.     On or about the dates listed below, in the District of Columbia and elsewhere, the defendant, EGHBAL SAFFARINIA (a/k/a "EDDIE SAFFARINIA"), did willfully and knowingly make and caused to be made material false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, HUD and OGE:

| COUNT | DATE | DESCRIPTION AND FALSE STATEMENT |
|---|---|---|
| 2 | 05/12/2014 | SAFFARINIA electronically signed, certified and submitted an OGE Form 278 through HUD and stated therein that during the reporting period he had no reportable liabilities in excess of $10,000 when, as SAFFARINIA well knew, he was receiving payments and loans from Person A in excess of $10,000. |
| 3 | 05/16/2015 | SAFFARINIA electronically signed, certified, and submitted an OGE Form 278 through HUD and stated therein that, during the reporting period, he had no reportable liabilities in excess of $10,000 when, as SAFFARINIA well knew, he was receiving payments and loans from Person A in excess of $10,000. |
| 4 | 04/26/2016 | SAFFARINIA electronically signed, certified, and submitted an OGE Form 278 through HUD and stated therein that, during the reporting period, he had no reportable liabilities in excess of $10,000, other than credit card debt, when, as SAFFARINIA well knew, he was receiving payments and loans from Person A and his neighbor each in excess of $10,000. |

(In violation of 18 U.S.C. §§ 1001(a)(2) and 2)

## COUNTS 5-7
## FALSIFICATION OF A RECORD OR DOCUMENT
### (Violation of 18 U.S.C. §§ 1519 and 2)

77. The allegations set forth in paragraphs 1 through 76 are realleged and incorporated by reference as though fully set forth herein.

78. On or about the dates listed below, in the District of Columbia and elsewhere, the defendant, EGHBAL SAFFARINIA (a/k/a "EDDIE SAFFARINIA"), with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, knowingly concealed, covered up, falsified, and made false entries in a record, document, and tangible object, to wit: SAFFARINIA caused the following forms to be filed with HUD and OGE, which falsely failed to report certain liabilities owed in the form of promissory notes:

| COUNT | DATE | DESCRIPTION AND FALSE STATEMENT |
|---|---|---|
| 5 | 05/12/2014 | SAFFARINIA electronically signed, certified, and submitted an OGE Form 278 through HUD and stated therein that during the reporting period he had no reportable liabilities in excess of $10,000 when, as SAFFARINIA well knew, he was receiving payments and loans from Person A in excess of $10,000. |
| 6 | 05/16/2015 | SAFFARINIA electronically signed, certified, and submitted an OGE Form 278 through HUD and stated therein that, during the reporting period, he had no reportable liabilities in excess of $10,000 when, as SAFFARINIA well knew, he was receiving payments and loans from Person A in excess of $10,000. |
| 7 | 04/26/2016 | SAFFARINIA electronically signed, certified, and submitted an OGE Form 278 through HUD and stated therein that, during the reporting period, he had no reportable liabilities in excess of $10,000, other than credit card debt, when, as SAFFARINIA well knew, he was receiving payments and loans from Person A and his neighbor each in excess of $10,000. |

(In violation of 18 U.S.C. §§ 1519 and 2)

A TRUE BILL:

_____
Foreperson

ANNALOU TIROL
Acting Chief, Public Integrity Section

By: _____
Edward P. Sullivan
Rosaleen T. O'Gara
Trial Attorneys
U.S. Department of Justice
Criminal Division, Public Integrity Section
1400 New York Avenue, N.W., 12th Floor
Washington, D.C. 20530
Tel: (202) 514-1412
Fax: (202) 514-3003
Edward.Sullivan@usdoj.gov
Rosaleen.O'Gara2@usdoj.gov