|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EGHBAL SAFFARINIA (a/k/a<br>"EDDIE SAFFARINIA"),<br><br>                Defendant. | Crim. Action No. 19-216 (EGS) |

<u>**MEMORANDUM OPINION**</u>

On June 25, 2019, a federal grand jury returned a seven-count Indictment against Defendant Eghbal Saffarinia ("Mr. Saffarinia"), a former Assistant Inspector General for the United States Department of Housing and Urban Development's Office of Inspector General ("HUD-OIG"), charging him with one count of concealing material facts, in violation of 18 U.S.C. §§ 1001(a)(1) and 2, three counts of making false statements, in violation of 18 U.S.C. §§ 1001(a)(2) and 2; and three counts of falsifying records, in violation of 18 U.S.C. §§ 1519 and 2. *See generally* Indictment, ECF No. 1 at 3-18 ¶¶ 10-78.[1]

Mr. Saffarinia moves to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b). Mr. Saffarinia separately moves for an Order compelling the government to

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

identify any known exculpatory information within its voluminous production, which consists of approximately 3.5 million pages of documents, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Upon careful consideration of the parties' submissions, the applicable law, and for the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Mr. Saffarinia's Motion to Dismiss, and **GRANTS IN PART** and **DENIES IN PART** Mr. Saffarinia's Motion for *Brady* Material.

## I. Background

The Court assumes the parties' familiarity with the factual background and the procedural history, which are set forth in greater detail in the Court's prior Opinion. *See United States v. Saffarinia*, No. CR 19-216 (EGS), 2019 WL 5086913, at *1 (D.D.C. Oct. 10, 2019). The Court will provide an abbreviated overview of the relevant statutory scheme, and then briefly summarize the allegations set forth in the Indictment.

### A. The Ethics in Government Act

"Enacted in the wake of the Watergate scandal," *Trump v. Mazars USA, LLP*, 940 F.3d 710, 714 (D.C. Cir. 2019), the Ethics in Government Act of 1978 ("EIGA"), 5 U.S.C. app. 4 §§ 101, *et seq.*, requires certain government employees to disclose "detail[s], with certain exceptions, [about] their income, gifts, assets, financial liabilities and securities and commercial real estate transactions[,]" *United States v. Oakar*,

2

111 F.3d 146, 148 (D.C. Cir. 1997) (citing 5 U.S.C. app. 4 §
102; *United States v. Rose*, 28 F.3d 181, 183 (D.C. Cir. 1994)).
Congress imposed these reporting requirements to "increase
public confidence in the federal government, demonstrate the
integrity of government officials, deter conflicts of interest,
deter unscrupulous persons from entering public service, and
enhance the ability of the citizenry to judge the performance of
public officials." *Id.*

To that end, the EIGA established the Office of Government
Ethics ("OGE") as a separate agency within the Executive Branch,
*see* 5 U.S.C. app. 4 § 401(a), which provides "overall direction
of executive branch policies related to preventing conflicts of
interest on the part of officers and employees of any executive
agency," *id.* § 402(a). An employee covered under the EIGA must
file public financial disclosure reports "with the designated
agency ethics official at the agency by which he [or she] is
employed . . . ." *Id.* § 103(a). OGE and the employee's agency
have the authority to "ensure compliance with government ethics
laws and regulations[,]" but the "primary responsibility" lies
with the employee's agency. 5 C.F.R. § 2638.501; *see also Defs.*
*of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 19
(D.D.C. 2004) ("OGE relies upon the agencies to perform these
functions, but the results of the agency's investigations and
its own conclusions about whether ethics violations actually

occurred are not the final word if the OGE finds that more needs to be done.").

The EIGA and its implementing regulations, 5 C.F.R. §§ 2634 *et seq.*, require members of the Senior Executive Service ("SES") to file public financial disclosure reports. *See generally* 5 U.S.C. § app. 4 § 101(f)(3).[2] Disclosures for SES members are made using the "OGE Form 278." *Saffarinia*, 2019 WL 5086913, at *8. Each report "*shall* include a full and complete statement" of the required information. 5 U.S.C. app. 4 § 102(a) (emphasis added). Failure to comply with the EIGA, its regulations, and the OGE Form 278 may subject the filer to civil penalties and criminal prosecution. *E.g.*, 5 U.S.C. app. 4 § 104(a)(1) (outlining civil penalty for knowingly and willfully falsifying required information); 5 C.F.R. § 2634.701(b) (substantially similar); *id*. § 2634.701(c) ("An individual may also be prosecuted under criminal statutes for supplying false

---

[2] Congress has defined an SES position as "any position in an agency which is classified above GS-15 pursuant to section 5108 or in level IV or V of the Executive Schedule, or an equivalent position, which is not required to be filled by an appointment by the President by and with the advice and consent of the Senate, and in which an employee" either "(A) directs the work of an organizational unit; (B) is held accountable for the success of one or more specific programs or projects; (C) monitors progress toward organizational goals and periodically evaluates and makes appropriate adjustments to such goals; (D) supervises the work of employees other than personal assistants; or (E) otherwise exercises important policy-making, policy-determining, or other executive functions." 5 U.S.C. § 3132(a)(2).

information on any financial disclosure report.");
*id.* § 2638.501 (stating that "the [OGE] Director will refer
possible criminal violations to an Inspector General or the
Department of Justice"); OGE Form 278 at 12 ("Knowing and
willful falsification of information required to be filed by
section 102 of [the EIGA] may also subject [the filer] to
criminal prosecution.").[3]

## B. Factual Background

The criminal charges here stem from Mr. Saffarinia's
alleged falsifications and omissions in his OGE Forms 278. *See*
Indictment, ECF No. 1 at 2 ¶ 4.[4] From 2012 until 2017,
Mr. Saffarinia served as HUD-OIG's Assistant Inspector General
for Information Technology ("IT"), and later as the Assistant
Inspector General for Management and Technology. *Id.* at 2 ¶ 3.
As an SES member, Mr. Saffarinia had a "legal duty" to submit
the OGE Forms 278 on May 12, 2014, May 16, 2015, and April 26,
2016, respectively. *See id.* at 2 ¶ 4, 18 ¶ 78. Mr. Saffarinia,

---

[3] OGE Form 278, Sched. C, U.S. Office of Gov't Ethics,
https://www.oge.gov/Web/OGE.nsf/0/BEB262ED3CE83F1E85257E96006B95
BE/$FILE/8c47512231004e2d98b6966829afebfb4.pdf.[hereinafter "OGE
Form 278"].

[4] The Court must presume the facts alleged in the Indictment as
true for purposes of deciding the motion to dismiss. *United
States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).
Although Mr. Saffarinia's motion to dismiss accepts the
allegations as true, he "intends to disprove them at trial."
Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss ("Def.'s
Mem."), ECF No. 27-1 at 11 n.1.

however, failed to disclose his liabilities in excess of $10,000 from "Person A or his neighbor to his supervisors, agency ethics officials or counsel, or on his [OGE Forms 278]." *Id.* at 17 ¶ 75.

Person A and Mr. Saffarinia were friends from college, and Person A owned an IT company ("Company A") in Virginia. *Id.* at 3 ¶¶ 6, 9. In 2013, Mr. Saffarinia received a loan from Person A in the amount of $80,000, but Mr. Saffarinia did not report it on his OGE Forms 278. *Id.* at 9-10 ¶¶ 37-41, 18 ¶ 78. Pursuant to a promissory note that was executed in 2015, Mr. Saffarinia received $90,000 from his neighbor, but Mr. Saffarinia did not disclose that liability on his OGE Forms 278. *Id.* at 17 ¶ 75.

At HUD-OIG, Mr. Saffarinia also served as Head of Contracting Activity, overseeing "procurement review and approval processes, including IT contracts[.]" *Id.* at 2 ¶ 5. During the period that Mr. Saffarinia received payments from Person A, Mr. Saffarinia steered government business, as well as gave competitive advantages, to Company A, and Mr. Saffarinia disclosed confidential government information to Person A and Company A. *Id.* at 3-4 ¶¶ 11-12, 4 ¶ 12, 14 ¶ 61. In 2012, Mr. Saffarinia caused Company B to enter into a business partnership with Person A and Company A, and Company A later served as Company B's subcontractor on a multi-year, $30 million IT services contract for HUD-OIG. *Id.* at 6 ¶ 18. In 2013, HUD-

OIG approved additional funding in the amount of $78,000 for Company A's subcontract with Company B. *Id*. at 10 ¶ 42. Company A received more than one million dollars as Company B's subcontractor from 2012 to 2015. *Id*. at 9 ¶ 36.

Mr. Saffarinia hired his friend and former business partner, Person B, as the head of HUD-OIG's new predictive analytics department. *Id*. at 3 ¶¶ 7, 9. And Person B became the sole member of a technical evaluation panel for a government contract at Mr. Saffarinia's direction. *Id*. at 16 ¶ 72. For that contract, Person B rejected thirteen bid proposals, and HUD-OIG awarded it to Person A and Company A. *Id*. From 2013 to 2014, Mr. Saffarinia caused HUD-OIG to recompete Company B's IT services contract, and he caused Company C to enter into a business partnership with Company A in order for both companies to submit a joint bid for the recompete contract. *Id*. at 11 ¶ 47. Mr. Saffarinia directed one of his subordinates to meet with Person A and Company C's owner for the formation of the partnership and the submission of the joint bid. *Id*. at 12 ¶ 50. HUD-OIG awarded the recompete contract, which was worth more than $17 million, to Company C. *Id*. at 11 ¶ 47. Company A became a subcontractor for Company C, and Company A was expected to receive roughly nine million dollars. *Id*.

## C. The Indictment

The charges against Mr. Saffarinia fall into three categories: (1) concealing material facts, in violation of 18 U.S.C. § 1001(a)(1) ("Count I"); (2) making false statements, in violation of 18 U.S.C. § 1001(a)(2) ("Counts II-IV"); and (3) falsifying records, in violation of 18 U.S.C. § 1519 ("Counts V-VII"). *See generally* Indictment, ECF No. 1 at 3-18 ¶¶ 10-78. Count I alleges that from "early 2012, and continuing thereafter until at least in or about mid-2016, in the District of Columbia and elsewhere, in a manner within the jurisdiction of the Executive Branch of the Government of the United States," Mr. Saffarinia "did knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device material facts . . . ." *Id*. at 3-4 ¶ 11. Count 1 asserts that Mr. Saffarinia violated § 1001(a)(1) by concealing four facts: (1) "the nature and extent of [Mr. Saffarinia's] financial relationship with Person A, including payments from Person A to [Mr. Saffarinia] totaling at least $80,000; (2) Mr. Saffarinia's "unauthorized disclosure of confidential government information to Person A"; (3) Mr. Saffarinia's "efforts to steer government contracts to Person A and Company A—by violating his legal duty to disclose a financial relationship with Person A, including on his annual OGE Forms 278"; and (4) "an actual and apparent conflict of interest in overseeing government business in which Person A and

Company A had a significant financial interest." *Id.* at 3-4 ¶ 11, 4 ¶ 12.

Next, Counts II through IV allege that Mr. Saffarinia violated § 1001(a)(2) by "willfully and knowingly mak[ing] and caus[ing] to be made material false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, HUD and OGE" when he submitted OGE Forms 278 in 2014, 2015, and 2016 that omitted the loans and payments from Person A. *Id.* at 17 ¶ 76. Count IV also alleges that Mr. Saffarinia made a false statement by not reporting the payments and loans from his neighbor on his 2016 OGE Form 278. *Id.*

Finally, Counts V through VII charge Mr. Saffarinia with obstruction of justice in violation of § 1519, and those counts allege that Mr. Saffarinia "with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, knowingly concealed, covered up, falsified, and made false entries in a record, document, and tangible object" when he caused his OGE Forms 278 to be filed with HUD and OGE. *Id.* at 18 ¶ 78. These obstruction charges list Mr. Saffarinia's 2014, 2015, and 2016 OGE Forms 278, alleging that he failed to report

his payments and loans in excess of $10,000 from Person A and his neighbor. *Id.*

### D. Mr. Saffarinia's Motions

On October 17, 2019, Mr. Saffarinia filed a motion to dismiss, *see* Def.'s Mot. to Dismiss, ECF No. 27, and a motion for *Brady* material, *see* Def.'s Mot. for Brady Material, ECF No. 28. On October 31, 2019, the government filed its opposition briefs. *See* Gov't's Opp'n, ECF No. 29; *see also* Gov't's Opp'n, ECF No. 31. Thereafter, Mr. Saffarinia filed his reply briefs. *See* Def.'s Reply, ECF No. 37; *see also* Def.'s Reply, ECF No. 38. The motions are ripe and ready for the Court's adjudication.

## II. Legal Standard

### A. Motion to Dismiss

A criminal defendant may move to dismiss an indictment before trial based on a "defect in the indictment," including for "lack of specificity" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). "[A] pretrial motion to dismiss an indictment allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015) (citation and internal quotation marks omitted). "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to

reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (citation omitted).

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). The notice requirement "is established in the Sixth Amendment, which provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation[.]'" *United States v. Hillie*, 227 F. Supp. 3d 57, 69 (D.D.C. 2017) (quoting U.S. Const. Amend. VI). "A valid indictment also preserves the Fifth Amendment's protections against abusive criminal charging practices; specifically, its guarantees that a criminal defendant can only be prosecuted for offenses that a grand jury has actually passed up on, and that a defendant who is convicted of a crime so charged cannot be prosecuted again for that same offense." *Id*.

### B. *Brady* and Its Progeny

Pursuant to *Brady* and its progeny, the government has an "an affirmative duty to disclose exculpatory evidence to the defense, even if no request has been made by the accused."

*United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir.), *cert. denied*, 137 S. Ct. 2315 (2017). In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *United States v. Giglio*, 405 U.S. 150, 154 (1972)). "[C]ourts in this jurisdiction look with disfavor on narrow readings by prosecutors of the government's obligations under *Brady*." *United States v. Edwards*, 191 F. Supp. 2d 88, 90 (D.D.C. 2002) (citing *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988)).

To prove a *Brady* violation, a movant must establish three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the [government], either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "To satisfy the prejudice component, the defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v.*

*Sitzmann*, 893 F.3d 811, 826 (D.C. Cir. 2018) (quoting *Bagley*, 473 U.S. at 682); *see also United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003) ("The defendant bears the burden of showing a reasonable probability of a different outcome.").

## III. Analysis

The Court first analyzes Mr. Saffarinia's motion to dismiss, concluding that: (1) the concealment charge under 18 U.S.C. § 1001(a)(1) does not specify the legal duty to disclose the four allegedly concealed material facts as identified in the Indictment; (2) the obstruction charges sufficiently allege that Mr. Saffarinia's falsifications and omissions in his OGE Forms 278 fall within the reach of 18 U.S.C. § 1519; and (3) the rule of lenity is inapplicable in this case. The Court then turns to Mr. Saffarinia's *Brady* motion, concluding that the government must identify any *Brady* material within its voluminous production to Mr. Saffarinia to the extent that the government knows of any such information.

### A. Motion to Dismiss

Mr. Saffarinia advances several arguments for dismissal. First, Mr. Saffarinia moves to dismiss Count I and Counts V through VIII on three grounds: (1) the Indictment does not allege a "trick, scheme, or device" under 18 U.S.C. § 1001(a)(1) as to Count I, Def.'s Mem., ECF No. 27-1 at 18-21; (2) the Indictment fails to allege that he had no legal duty to disclose

at least three of the allegedly four concealed facts in Count I, *id.* at 14-18; and (3) the Indictment fails to allege an "investigation" or the "proper administration of any matter" within the meaning of 18 U.S.C. § 1519 as to Counts V through VII, *id.* at 22-24. Finally, Mr. Saffarinia argues that the Indictment should be dismissed because the charge to the grand jury "appears" to have been improper. *Id.* at 34. The Court will address each argument in turn.

### 1. Concealment Charge under 18 U.S.C. § 1001(a)(1)

Count I of the Indictment charges Mr. Saffarinia with a scheme to conceal material facts. *See* Indictment, ECF No. 1 at 3-4 ¶ 11. Under Section 1001(a)(1), it is a crime to "conceal[], or cover[] up by any trick, scheme, or device a material fact." 18 U.S.C. § 1001(a)(1). A violation under Section 1001(a)(1) predicated on concealment has five elements: (1) the defendant had a duty to disclose the material information imposed by statute, regulation, or government form; (2) the defendant concealed or covered up the facts using a trick, scheme, or device; (3) the concealed facts were material; (4) the defendant concealed those facts knowingly and willfully; and (5) the concealed information concerned a matter within the jurisdiction of the Executive Branch. *E.g.*, *United States v. Bowser*, 318 F. Supp. 3d 154, 168 (D.D.C. 2018) (Sullivan, J.) (listing the § 1001(a)(1) elements); *United States v. White Eagle*, 721 F.3d

1108, 1116 (9th Cir. 2013) (same).

Here, Mr. Saffarinia only challenges the first two elements. *See* Def.'s Mem., ECF No. 27-1 at 14-21. Before turning to those elements, the Court will address the parties' disagreement as to the applicable statute of limitations.

### a. Count One Is Not Time-Barred

Section 1001 is governed by the five-year statute of limitations. *See* 18 U.S.C. § 3282(a) ("[N]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed."). In this case, the grand jury returned the Indictment against Mr. Saffarinia on June 25, 2019. *See generally* Indictment, ECF No. 1 at 1. Typically, any criminal conduct before June 25, 2014 would fall outside of the applicable limitations period. *See* 18 U.S.C. § 3282(a). With the execution of the tolling agreements, however, the parties agree that the date for the statute of limitations is May 6, 2014. *See* Def.'s Mem., ECF No. 27-1 at 19 n.4; *see also* Gov't's Opp'n, ECF No. 31 at 9-10.

Mr. Saffarinia contends that "any conduct charged prior to May 6, 2014 falls outside the limitations period." Def.'s Mem., ECF No. 27-1 at 19 n.4. Mr. Saffarinia goes on to argue that the government must show that "'on least one occasion after' the applicable statute of limitations date, the defendant 'concealed

15

or covered up' a material fact." *Id*. (quoting Gov't's Proposed
Jury Instructions, *United States v. Craig*, Crim. Action No. 19-
125 (D.D.C. July 22, 2019), ECF No. 72-2 at 11); Def.'s Reply,
ECF No. 38 at 20 n.5 (noting that "the jury cannot convict if
the government has not proven at least one act of concealment
within the limitations period"). The government responds that
Mr. Saffarinia has been charged with a single concealment
scheme, and "numerous courts, including this [Court], have held
that a scheme to conceal material facts is not complete for
statute of limitations purposes until the final affirmative act
in furtherance of the scheme is taken." Gov't's Opp'n, ECF No.
31 at 9 (collecting cases). Mr. Saffarinia does not attempt to
distinguish the government's cited cases. *See* Def.'s Reply, ECF
No. 38 at 19 n.5.

To begin, "[s]tatutes of limitations normally begin to run
when the crime is complete." *Toussie v. United States*, 397 U.S.
112, 115 (1970) (quoting *Pendergast v. United States*, 317 U.S.
412, 418 (1943)). As the United States Court of Appeals for the
District of Columbia Circuit ("D.C. Circuit") has recognized,
"first-year law students (presumably) learn [that] a criminal
offense is typically completed as soon as each element of the
crime has occurred." *United States v. McGoff*, 831 F.2d 1071,
1078 (D.C. Cir. 1987). "A 'continuing offense,' . . ., is an
unlawful course of conduct that does perdure." *Id*. And "*the*

16

*statute of limitations as to prosecutions for continuing offenses runs from the last day of the continuing offense.*" *Id.* at 1079 (citation omitted).

The D.C. Circuit has held that § 1001 is a continuing offense for purposes of the statute of limitations. *Bramblett v. United States*, 231 F.2d 489, 490-91 (D.C. Cir. 1956). In *Bramblett*, a member of Congress was charged with engaging in a scheme to falsify material facts under § 1001 by submitting a form with false information to a Congressional office. *Id.* at 490. The D.C. Circuit rejected the defendant's argument that the § 1001 charge was time-barred as a result of the crime being completed when he filed the false form because the defendant repeatedly benefited from the falsification over the course of the scheme. *Id.* at 490-91. "By 'falsifying a material fact, and in leaving it on file, thereby continuing the falsification in order repeatedly to partake of the fruits of the scheme,' the defendant committed a continuing crime of falsification by scheme that 'fairly falls within the terms of section 1001.'" *United States v. Hubbell*, 177 F.3d 11, 13 (D.C. Cir. 1999) (quoting *Bramblett*, 231 F.2d at 491). Thus, "the conduct of the defendant which constituted the scheme did not terminate until the scheme itself ended." *Bramblett*, 231 F.2d at 492.[5]

---

[5] Neither party disputes that *Bramblett* is binding on this Court, and courts in this Circuit still recognize *Bramblett* as

The Court agrees with the government that the Indictment alleges a "single scheme to conceal that involved multiple false statements, omissions, and other acts, much of which occurred within the statutory period." Gov't's Opp'n, ECF No. 31 at 9. According to the Indictment, the alleged scheme began in 2012 and ended in 2016. Indictment, ECF No. 1 at 4 ¶ 13. Mr. Saffarinia committed a continuing crime of concealment by scheme, *see Bramblett*, 231 F.2d at 491, because Mr. Saffarinia allegedly left on file in his OGE Forms 278, among other things, the concealed material facts, including payments from Person A and the $80,000 loan, during the alleged scheme, *see* Indictment, ECF No. 1 at 4-5 ¶ 13. What is more, the Indictment alleges that Mr. Saffarinia committed certain acts in furtherance of the alleged scheme through 2016. *See* Indictment, ECF No. 1 at 16 ¶ 73. Mr. Saffarinia's last-filed OGE Form 278 was submitted on April 26, 2016. *Id*. at 17 ¶ 76. And the Indictment asserts that Mr. Saffarinia failed to report his liabilities in his OGE Forms 278 that were submitted through HUD. *Id*. at 4-5 ¶ 13. Although

---

controlling precedent. *E.g.*, *United States v. Michel*, No. CR 19-148-1 (CKK), 2019 WL 5797669, at *7 (D.D.C. Nov. 6, 2019) (observing that "*Hubbell*'s discussion and affirmation of *Bramblett* demonstrates that the case is still binding on this Court"); *United States v. Craig*, 401 F. Supp. 3d 49, 76 (D.D.C. 2019) (same); Hr'g Tr., *United States v. Stevens*, Crim. Action No. 08-231 (D.D.C. Sept. 10, 2008), ECF No. 64 at (finding that "defendant's contention that *Bramblett* no longer is good law is unavailing").

some of the alleged conduct fell outside of the limitations period, *see id.* at 6-16 ¶¶ 18-73, Mr. Saffarinia is charged with a single concealment scheme that allegedly ended in 2016, *id.* at 3-4 ¶ 11. The Court therefore finds that the allegations in Count I are timely.

### b. Scheme, Trick, or Device

The Court next considers whether the Indictment alleges a "scheme, trick, or device" within the meaning of § 1001(a)(1). *See United States v. Woodward*, 469 U.S. 105, 108 (1985) ("Section 1001 proscribes the nondisclosure of a material fact only if the fact is 'conceal[ed] . . . by any *trick*, *scheme*, or *device*[.]'"); *see also United States v. Safavian*, 528 F.3d 957, 965 n.8 (D.C. Cir. 2008) ("[C]oncealment must be accomplished in a particular way: by a 'trick, scheme, or device.'"). Mr. Saffarinia argues that the Indictment "fails to allege concealment of [the] fact [that he had a duty to disclose the $80,000 loan from Person A on his OGE Forms 278] **by means of** a 'trick, scheme, or device'" because "[a] trick, scheme, or device requires an affirmative act of concealment; a mere false statement is not enough." Def.'s Mem., ECF No. 27-1 at 18. The government responds that the Indictment sufficiently alleges a scheme, trick, or device, and that Mr. Saffarinia's "specific argument deals with trial proof, not the sufficiency of the indictment's allegations." Gov't's Opp., ECF No. 31 at 7.

Mr. Saffarinia is correct that an affirmative act by which a material fact is concealed is necessary to prove a violation of the concealment prong of § 1001. *Bowser*, 318 F. Supp. 3d at 169 (citing *United States v. London*, 550 F.2d 206, 213 (5th Cir. 1977). "The case law is clear that the deliberate failure to disclose material facts in the face of a specific duty to disclose such information constitutes a violation of the concealment provision of § 1001." *United States v. Dale*, 782 F. Supp. 615, 626 (D.D.C. 1991), *aff'd*, 991 F.2d. 819 (D.C. Cir. 1993). A defendant's "nondisclosure [must be] distinguishable from a 'passive failure to disclose' or 'mere silence in the face of an unasked question.'" *Dale*, 782 F. Supp. at 626. And "the government bears the burden of demonstrating more than a mere passive failure to disclose something; it must show that the defendant 'committed affirmative acts constituting a trick, scheme, or device.'" *Craig*, 401 F. Supp. 3d at 63 (quoting *London*, 550 F.2d at 213).

Here, Mr. Saffarinia does not suggest that the Indictment is based on a passive failure to disclose information. *See* Def.'s Mem., ECF No. 27-1 at 18-21; *see also* Def.'s Reply, ECF No. 38 at 18-19. Rather, Mr. Saffarinia argues that the Indictment fails to allege a trick, scheme, or device based on the allegation that he "concealed the existence of the [$80,000] loan by falsely stating that his OGE Forms 278 were truthful and

complete." Def.'s Mem., ECF No. 27-1 at 21. Mr. Saffarinia seeks to impose temporal limitations on the alleged acts of concealment, arguing that the Indictment points to actions taken before he incurred the $80,000 debt to "suggest improper concealment." *Id*. at 19. According to the Indictment, Mr. Saffarinia received his first payment from Person A on or about June 25, 2013. Indictment, ECF No. 1 at 9 ¶ 37. The Indictment lists more than eight separate amounts of cash payments from Person A to Mr. Saffarinia from July 2013 to November 2013. *Id*. at 9-10 ¶¶ 38-39. Mr. Saffarinia contends that the pre-June 2013 allegations—his failure to sign a "Conflict of Interest Acknowledgment and Nondisclosure Agreement" from GSA's contracting officer, *id*. at 6 ¶ 21, and his e-mails to Person A in June 2012 and July 2012 attaching certain HUD-OIG documents, *id*. at 7 ¶¶ 26-27—cannot constitute affirmative acts to conceal the $80,000 loan. *See* Def.'s Mem., ECF No. 27-1 at 19.

The post-June 2013 allegations in the Indictment include Mr. Saffarinia's efforts to increase Person A's work hours under Company B's IT contract and cause HUD-OIG to recompete the IT services contract and encourage Company C to partner with Person A and Company A on the contract. *Id*. at 20 (citing Indictment, ECF No. 1 at 10-14 ¶¶ 42-60). The remaining allegations also include Mr. Saffarinia's actions that gave a competitive

advantage to Person A for a certain contract, and his disregard of directives from his supervisors to terminate Person A as a government contractor. *Id.* (citing Indictment, ECF No. 1 at 11 ¶ 44, 14-16 ¶¶ 61-73). According to Mr. Saffarinia, the post-June 2013 allegations do not amount to concealment of the $80,000 loan from Person A. *Id.* at 20.

The government disagrees with Mr. Saffarinia's suggestion that "the affirmative acts of concealment 'predate' his duty to disclose." Gov't's Opp'n, ECF No. 31 at 8. According to the government, Mr. Saffarinia took affirmative acts to conceal "hundreds of thousands of dollars from Person A over a multi-year period, including the payments made pursuant to the promissory note in 2013." *Id.*

The Court is not persuaded by Mr. Saffarinia's arguments because the Court "must give full effect to the 'trick, scheme, or device' language in [the concealment] prong of section 1001 . . . ." *Craig*, 401 F. Supp. 3d at 63 (quoting *London*, 550 F.2d at 213). The government argues—and the Court agrees—that the Indictment alleges "a single scheme to conceal that involved multiple false statements, omissions, and other acts." Gov't's Opp'n, ECF No. 31 at 9. This alleged scheme occurred between 2012 and 2016. Indictment, ECF No. 1 at 4 ¶ 13. And the Indictment sets forth allegations within the relevant time period (from 2012 through 2016) that Mr. Saffarinia concealed,

among other things, his payments and the $80,000 loan from
Person A. *See id.* at 6-16 ¶¶ 18-73. The Indictment charges that
a purpose of Mr. Saffarinia's scheme was to conceal, *inter alia*,
"tens of thousands of dollars in payments from Person A and an
outstanding $80,000 promissory note on which payment was owed to
Person A." *Id.* at 4 ¶ 12. Under the "SAFFARINIA Received $80,000
from Person A" heading, the Indictment provides the loan and a
list of Mr. Saffarinia's payments from Person A. *Id.* at 9-10 ¶¶
37-41.

Mr. Saffarinia's other argument—that his alleged
falsifications or omissions alone do not constitute a trick,
scheme, or device within the meaning of § 1001(a)(1)—is
unavailing. *See* Def.'s Mem., ECF No. 27-1 at 21. To support his
position, Mr. Saffarinia cites to *Safavian* and two out-of-
Circuit decisions. *Id.* (citing *Safavian*, 528 F.3d at 967 n.12;
*London*, 550 F.2d at 212-14; *United States v. St. Michael's
Credit Union*, 880 F.2d 579, 589 (1st Cir. 1989)); *see also*
Def.'s Reply, ECF No. 38 at 19. Mr. Saffarinia's assertion—that
a false statement *alone* cannot constitute a trick, scheme, or
device—is not settled law. *See Craig*, 401 F. Supp. 3d at 73. In
*Safavian*, the D.C. Circuit noted, in dicta, the defendant was
"correct on the law" that "a false statement alone cannot
constitute a 'trick, scheme, or device'," 528 F.3d at 967 n.12
(collecting cases), but that the defendant there waived the

argument on appeal, as acknowledged by Mr. Saffarinia, *see* Def.'s Mem., ECF No. 27-1 at 18-19. In *London*, the Fifth Circuit did not hold that false statements could not state an offense under Section 1001. 550 F.2d at 212-14; *see also Craig*, 401 F. Supp. 3d at 73.

In *St. Michael's Credit Union*, the defendants' convictions under § 1001 arose from the financial institution's failure to file Currency Transaction Reports ("CTRs") with the Internal Revenue Service ("IRS"). 880 F.2d at 581. The First Circuit vacated the convictions because the trial judge did not instruct the jury that the government had to prove "some 'affirmative act' of concealment beyond the failure to file CTRs." *Id.* at 589. The First Circuit held that "[a]bsent other acts that might form part of a scheme to affirmatively conceal facts from a federal agency, we do not believe the failure to file CTRs— standing alone—can support a conviction under § 1001." *Id.* at 591. More than twenty-two years after deciding *St. Michael's Credit Union*, the First Circuit clarified that "simple omissions fall short of constituting affirmative acts of concealment, which are required to prove a 'scheme, trick, or device.'" *United States v. Mubayyid*, 658 F.3d 35, 69-71 (1st Cir. 2011) (citing *St. Michael's Credit Union*, 880 F.2d at 589).

In *Mubayyid*, the defendant-treasurer of a tax-exempt organization signed and filed IRS Forms 990 in three different

tax years that contained materially false information about the organization's non-charitable activities. *Id*. at 58. The First Circuit affirmed the defendant's § 1001(a)(1) conviction for scheming to conceal material facts from the IRS, rejecting his arguments that the government's evidence was insufficient and that the government failed to prove a specific scheme. *Id*. at 69-71. In doing so, the First Circuit reasoned that the defendant had a legal duty to disclose and "by filing the false Form 990s, which he signed under penalty of perjury, [the defendant] did not passively fail to disclose material facts; he engaged in an affirmative act of concealment." *Id*. at 70 (citing *St. Michael's Credit Union*, 880 F.2d at 590-91).

Here, Mr. Saffarinia's alleged false OGE Forms 278 closely resemble the defendant's false IRS forms in *Mubayyid*. The Indictment alleges that Mr. Saffarinia concealed certain liabilities in his OGE Forms 278—his payments and loan from Person A. Indictment, ECF No. 1 at 4 ¶ 11. Mr. Saffarinia concedes that the OGE Forms 278 may have imposed a duty to disclose the $80,000 loan from Person A. *See* Def.'s Mem., ECF No. 27-1 at 18-21. Mr. Saffarinia does not challenge that the loan and the details about the loan are material facts that he did not disclose on his OGE Forms 278. *See id*. In his own words, "the Indictment alleges that Mr. Saffarinia concealed the existence of the loan by falsely stating that his OGE Forms 278

were truthful and complete." *Id.* at 21. The Court therefore finds that the Indictment sufficiently alleges a scheme to conceal because it contains allegations that Mr. Saffarinia engaged in affirmative acts of concealment by actively filing the OGE Forms 278 that allegedly contained false statements. The Court concludes that the Indictment alleges a "scheme, trick, or device" within the meaning of § 1001(a)(1). Accordingly, the Court **DENIES IN PART** Mr. Saffarinia's motion to dismiss.

### c. Legal Duty to Disclose

The Court next considers whether the Indictment alleges that Mr. Saffarinia had a legal duty to disclose the concealed material facts. The parties disagree as to whether Mr. Saffarinia had a legal duty to disclose the following four allegedly concealed facts:

> (1) Mr. Saffarinia's unauthorized disclosure of confidential information to Person A; (2) Mr. Saffarinia's alleged efforts to steer government contracts to Person A and Company A; (3) the existence of an actual or potential conflict of interest; and (4) the nature and extent of Mr. [Saffarinia's] financial relationship with Person A.

Def.'s Mem., ECF No. 27-1 at 16 (citing Indictment, ECF No. 1 at 2-3 ¶ 5, 3-4 ¶ 11, 5 ¶ 16).

Neither party disputes that a "conviction under § 1001(a)(1) *requires* a legal obligation—imposed by statute, regulation, or form—to disclose material facts." *Id.* (citing

*Safavian*, 528 F.3d at 964); *see also* Gov't's Opp'n, ECF No. 31 at 4. The parties agree that Mr. Saffarinia's legal duties arose from three sources: (1) the EIGA; (2) the OGE regulations, 5 C.F.R. §§ 2634, *et seq.*; and (3) the OGE Form 278. *See, e.g.*, *Saffarinia*, 2019 WL 5086913, at *8; Gov't's Opp'n, ECF No. 31 at 5; Def.'s Reply, ECF No. 38 at 11. Mr. Saffarinia's primary argument is that the Indictment fails to identify a legal duty to disclose the four allegedly concealed facts, and that the three sources—the EIGA, the OGE regulations, and the OGE Form 278—do not require the disclosure of those facts. *See* Def.'s Mem., ECF No. 27-1 at 16; *see also* Def.'s Reply, ECF No. 38 at 11.

"[T]he Court must first decide, as a matter of law, whether [a legal] duty [to disclose] existed." *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 345 (D.D.C. 1997). "Concealment cases in this circuit and others have found a duty to disclose material facts on the basis of *specific requirements* for disclosure of *specific information*." *Safavian*, 528 F.3d at 964 (emphasis added). The D.C. Circuit has explained that this specificity is rooted in the Due Process Clause of the Fifth Amendment to the United States Constitution, which requires a criminal defendant to have "fair notice . . . of what conduct is forbidden." *Id.* (quoting *United States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999)). "[T]his 'fair warning' requirement

prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal." *Kanchanalak*, 192 F.3d at 1046. Vague standards and the "ethical principles" embodied in them did not impose a clear duty to disclose information. *Safavian*, 528 F.3d at 964–65; *see also Saffarinia*, 2019 WL 5086913, at *8 (discussing the holding in *Safavian*).

Consistent with *Safavian*, courts have recognized that a defendant's duty to disclose specific information must be found in statutes, regulations, or government forms. *See, e.g.*, *White Eagle*, 721 F.3d at 1117 ("[A] conviction under § 1001(a)(1) is proper where a statute or government regulation requires the defendant to disclose specific information to a particular person or entity."); *Craig*, 401 F. Supp. 3d at 64–68 (holding that defendant had a legal duty to disclose under the Foreign Agents Registration Act ("FARA") and the FARA registration form); *Crop Growers Corp.*, 954 F. Supp. at 346–48 (holding that defendants did not have a duty to disclose whether they violated campaign finance laws in mandatory filings to the Securities and Exchange Commission).

In this case, Mr. Saffarinia does not dispute—and the Court agrees—that he had a legal duty to disclose the $80,000 loan from Person A and "certain ancillary details, such as the interest rate, the date of maturity, etc." on his OGE Forms 278.

Def.'s Mem., ECF No. 27-1 at 17. Indeed, Section 102(a)(4) of the EIGA provides, in relevant part, that "[e]ach report filed . . . shall include a full and complete statement with respect to . . . [t]he identity and category of value of the total liabilities owed to any creditor other than a spouse, or a parent, brother, sister, or child of the reporting individual or of the reporting individual's spouse which exceed $10,000 at any time during the preceding calendar year," subject to certain exclusions. 5 U.S.C. app. 4 § 102(a)(4). Section 2634.305 of the OGE regulations contains nearly identical language. *See* 5 C.F.R. § 2634.305(a) ("[E]ach financial disclosure report filed pursuant to this subpart must identify and include a brief description of the filer's liabilities exceeding $10,000 owed to any creditor at any time during the reporting period, and the name of the creditors to whom such liabilities are owed."). And the OGE Form 278 unambiguously provides that "[the EIGA] requires [the filer] to disclose certain of [his or her] financial liabilities," including to "[i]dentify and give the category of amount of the liabilities which [the filer], [his or her] spouse or dependent child owed to any creditor which exceeded $10,000 at any time during the reporting period." OGE Form 278 at 10.

The Indictment makes clear that Mr. Saffarinia's legal duty was imposed by the EIGA, the OGE regulations, and the OGE Form

278. *See* Indictment, ECF No. 1 at 2 ¶ 4. On its face, the
Indictment alleges that Mr. Saffarinia had a legal duty to
disclose the specific information of the $80,000 loan from
Person A. *See* Indictment, ECF No. 1 at 2 ¶ 4, 4 ¶¶ 11-12. And
Mr. Saffarinia concedes that he had a "duty to disclose
liabilities over $10,000 owed to any one creditor at a time
within the annual reporting period (along with ancillary details
concerning the debt) . . . ." Def.'s Reply, ECF No. 38 at 11.
The Court therefore finds that the Indictment sufficiently
alleges that Mr. Saffarinia had a legal duty to disclose this
specific information in his OGE Forms 278. *See Safavian*, 528
F.3d at 964.

The question remains whether Mr. Saffarinia had a legal
duty to disclose "anything else about his relationship with
Person A." Def.'s Mem., ECF No. 27-1 at 17. According to
Mr. Saffarinia, "[the OGE Form 278] did not require [him] to
disclose that Person A and Company A had a financial interest in
HUD-OIG business, the nature and extent of his 'personal
relationship' with Person A, or his alleged efforts to steer
lucrative governmental business to Person A," *id.* (citing
Indictment, No. 1 at 4 ¶ 12, 5 ¶ 16). Mr. Saffarinia notes that
"the Indictment does not identify any statute, regulation, or
form (other than OGE Form 278 . . .) that would have imposed a
legal obligation to make [the] disclosures" about his financial

relationship with Person A to "other contracting officials and agency ethics officials and counsel." *Id.* at 17 n.3.

The government responds that Mr. Saffarinia "failed to disclose [his] *longstanding and substantial financial relationship* [with Person A] (and another large promissory note from his neighbor) on his public financial disclosure forms ('OGE Forms 278') and to agency ethics officials and supervisors." Gov't's Opp'n, ECF No. 31 at 2 (emphasis added). According to the government, the Indictment alleges that Mr. Saffarinia's "unambiguous" legal duties to disclose his longstanding financial relationship with Person A arose from his positions as a "high-ranking HUD-OIG official," a member of the SES, and the Head of Contracting Activity, as well as his role "supervis[ing], review[ing], approv[ing], and participat[ing] in HUD-OIG's procurement activity." *Id.* at 5 (citing Indictment, No. 1 at 2 ¶¶ 3-5). The government notes that Mr. Saffarinia's legal duties to disclose included "his obligations under [the EIGA], which, among other things, requires the disclosure of noninvestment income, gifts, and liabilities over $10,000 through the filing of the OGE Form 278." *Id.* at 5 n.2.

Mr. Saffarinia argues—and the Court agrees—that the government "points to nothing in the text of [the EIGA], its implementing regulations, or OGE Form 278 that would suggest a duty to disclose, in general terms, a 'longstanding financial

relationship.'" Def.'s Reply, ECF No. 38 at 11. The government does not deny that the three sources of Mr. Saffarinia's legal duty to disclose are the EIGA, the OGE's regulations, and the OGE Form 278. *See* Gov't's Opp'n, ECF No. 31 at 5-6 (citing *Saffarinia*, 2019 WL 5086913, at *8); *see also* Def.'s Reply, ECF No. 38 at 13. In a footnote, however, the government asserts that Mr. Saffarinia's duties to disclose included:

> [H]is responsibility under *acquisition regulations* to safeguard confidential or source sensitive procurement information and use it only for appropriate purposes; to avoid strictly, and disclose, any conflict of interest or even the appearance of a conflict of interest; and to not solicit or accept anything of monetary value, including loans from anyone who has or is seeking to obtain government business with the employee's agency, conducts activities that are regulated by the employee's agency, or has interests that may be substantially affected by the performance or nonperformance of the employee's official duties.

Gov't's Opp'n, ECF No. 31 at 5 n.2 (emphasis added). In its opposition brief, the government identifies for the first time other sources that purportedly imposed a legal duty on Mr. Saffarinia to disclose his longstanding financial relationship with Person A and other information. *Id*. Specifically, the government cites the following five sources:

> 1. Federal Acquisition Regulations ("FAR"), 48 C.F.R. ch. 3 and § 3.101-2;

> 2. General Service Administration Regulations ("GSAR"), 48 C.F.R. ch. 5;

32

3. General Service Administration Acquisition Manual ("GSAM"), part 503;

4. Housing & Urban Development Acquisition Regulations ("HUDAR"), 48 C.F.R. ch. 24, pt. 2403; and

5. HUD's Office of the Chief Procurement Officer Guidance and Handbook 2210.3 ("OCPO Handbook"), ch. 2403.

*Id*. The government relies on these sources to support its argument that Mr. Saffarinia's legal duties to disclose arose from his "various positions and responsibilities" and his "substantial participation and involvement in HUD-OIG's procurements." *Id*. Courts "generally decline[] to consider an argument if a party buries it in a footnote and raises it in only a conclusory fashion." *Nat'l Oilseed Processors Ass'n v. OSHA*, 769 F.3d 1173, 1184 (D.C. Cir. 2014). Nonetheless, Mr. Saffarinia raises various arguments as to the additional sources identified in the government's opposition brief. *See* Def.'s Reply, ECF No. 38 at 12-18.

Turning to those sources, the government does not explain how the additional sources indicate the specific information that Mr. Saffarinia was required to disclose. *See* Gov't's Opp'n, ECF No. 31 at 5-6. Furthermore, the Indictment does not mention or cite the "acquisition regulations," other regulations, policies, GSAM, and OCPO Handbook. *See generally* Indictment, ECF No. 1 at 2-3 ¶ 5 ("[Mr. Saffarinia] therefore had a legal duty

under governing regulations to disclose actual and potential conflicts of interest and to not solicit and accept anything of monetary value . . . ."); *see also* Def.'s Reply, ECF No. 38 at 14. The parties, however, agree that any legal duty arose from the EIGA, the *OGE regulations*, and the OGE Form 278.

Mr. Saffarinia contends that Chapter 3, title 48 of the Code of Federal Regulations, *see* 48 C.F.R. §§ 301.101-370.701, applies to the United States Department of Health and Human Services, *see id*. § 301.101(a). Def.'s Reply, ECF No. 38 at 14 ("It imposes no duties at all on HUD-OIG employees like Mr. Saffarinia."). And Mr. Saffarinia argues that 48 C.F.R. § 3.101-2 bars "government employees from soliciting or accepting anything of monetary value from anyone who has business before that employee's agency, who conducts activities regulated by that agency, or whose interests may be substantially affected by that employee's performance of his duties." *Id*. at 15.[6] A fair reading of Section 3.101-2, which falls within the "Standards of Conduct" section, does not unambiguously impose a legal duty to

---

[6] Section 3.101-2 provides that "[a]s a rule, no Government employee may solicit or accept, directly or indirectly, any gratuity, gift, favor, entertainment, loan, or anything of monetary value from anyone who (a) has or is seeking to obtain Government business with the employee's agency, (b) conducts activities that are regulated by the employee's agency, or (c) has interests that may be substantially affected by the performance or nonperformance of the employee's official duties. Certain limited exceptions are authorized in agency regulations." 48 C.F.R. § 3.101-2.

disclose. *See* 48 C.F.R. § 3.101-2; *see also Safavian*, 528 F.3d at 964 (holding that there is no legal duty to disclose where "the government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees").

Next, the government cites Chapter 5, title 48 of the Code of Federal Regulations, *see* 48 C.F.R. §§ 501.101-570.802. *See* Gov't's Opp'n, ECF No. 31 at 5 n.2. The government points out that Mr. Saffarinia "received and was asked to sign a 'Conflict of Interest Acknowledgement and Nondisclosure Agreement' from GSA's contracting officer," *id.* at 6 (citing Indictment, ECF No. 1 at 6 ¶ 21), and that agreement required him to "safeguard and use proposal information for appropriate purposes, not disclose proposal information improperly, and acknowledge that he was conflict-free, with an on-going duty to report any actual or apparent conflicts[,] *id.* at 7. The government argues that Mr. Saffarinia is "mistaken" in suggesting that he had no legal duty to disclose "his efforts to steer contracts and work to Person A and to engage in covert communications with Person A," *id.* at 6, because "the governing *acquisition regulations* . . . required him to disclose his improper relationship with Person A on his OGE Form 278 and to agency ethics officials and counsel as part of the procurement process[,]" *id.* at 7 (emphasis added). As previously noted, the Indictment does not reference

these "acquisition regulations." *See generally* Indictment, ECF
No. 1 at 2 ¶ 5.

Mr. Saffarinia's next argument is that "[a] disclosure
requirement is similarly absent from Part 503 of the GSAM and
the GSAR." Def.'s Reply, ECF No. 38 at 16. According to
Mr. Saffarinia, "Part 503 requires the **contracting officer** to
'use the Conflict of Interest Acknowledgment and Nondisclosure
Agreement . . . to maintain the identity of individuals' who
have access to certain contract information." *Id.* (citation
omitted). Mr. Saffarinia points out that he was not a
contracting officer, and that the Indictment alleges that he
never signed the agreement. *Id.*; *see also* Indictment, ECF No. 1
at 6 ¶ 21. Had he signed the "Conflict of Interest
Acknowledgement and Nondisclosure Agreement," Mr. Saffarinia
does not dispute that he would have had a legal duty to disclose
any actual or apparent conflicts of interest as HUD-OIG's Head
of Contracting Activity. *See* Def.'s Reply, ECF No. 38 at 16. But
Mr. Saffarinia points out that "[a]n agreement to which [he] has
never acquiesced imposes no legal duty at all." *Id.* (citing
*Bowser*, 318 F. Supp. 3d at 170).

*Bowser* is illustrative of this point. In that case, this
Court found that the evidence adduced in the government's case-
in-chief at trial was sufficient to support the defendant's
concealment conviction under § 1001(a)(1) because, *inter alia*,

"although [the defendant] may not have had any preexisting duty to disclose documents or information to the [Office of Congressional Ethics ("OCE")], a duty was imposed upon him *after* he signed forms agreeing that he would not 'falsif[y], [conceal], or cover[] up by any trick, scheme, or device' a 'material fact' within the purview of the OCE's investigation." *Bowser*, 318 F. Supp. 3d at 170 (emphasis added). Similarly, in *United States v. Moore*, 446 F.3d 671, 678 (7th Cir. 2006), the Seventh Circuit held that the defendant's duty to disclose her conflicts of interest to municipal officials arose when she signed contracts to receive HUD block grant funds, and the contracts incorporated the applicable HUD conflicts-of-interest regulation.

The Seventh Circuit also held that the duty to disclose was triggered "in the course of [the defendant's] communications with City officials who were investigating the conflict-of-interest problem." *Id*. The Seventh Circuit reasoned that "even if [the defendant] did not—as she argue[d]—read the contract and thus was ignorant for a time of her legal obligation, the continued inquiries from City officials about the relationships . . . and the concerns expressed by City officials about conflicts of interest repeatedly triggered a duty to disclose." *Id*. The Seventh Circuit explained that "[o]nce the City explicitly asked for the information, the failure to respond

honestly is something far greater than a failure to volunteer information." *Id.*

Unlike the defendants in *Moore* and *Bowser* who signed documents imposing legal duties to disclose certain information, Mr. Saffarinia never signed the "Conflict of Interest Acknowledgement and Nondisclosure Agreement" that purportedly required him to disclose his actual and apparent conflicts of interest. *See* Def.'s Reply, ECF No. 38 at 16; *see also* Gov't's Opp'n, ECF No. 31 at 6-7. In some respects, Mr. Saffarinia's situation is similar to the defendant's situation in *Moore* because the defendant there had a legal duty to disclose conflicts of interest when she was explicitly asked about them by the City officials. *See id.* at 678. The Indictment alleges that Mr. Saffarinia did not disclose his relationship with Person A to his supervisors. *See* Indictment, ECF No. 1 at 11 ¶ 44.

According to the Indictment, "[o]n or about December 6, 2013, when Person A attended a large meeting that included [Mr. Saffarinia] and his supervisors, [Mr. Saffarinia] misrepresented to his supervisors the nature of his relationship with Person A and Person A's role on Company B's IT services contract." Indictment, ECF No. 1 at 11 ¶ 44. The Indictment alleges that Mr. Saffarinia's "supervisors directed [him] to remove Person A as a government contractor as soon as Person A

finished an existing project[,]" but Mr. Saffarinia "ignored the directive." *Id*. Unlike in *Moore* where the defendant's duty to disclose the conflict of interest arose based on the City officials' inquiries during an investigation, the Indictment here does not allege that Mr. Saffarinia's supervisors were specifically investigating a conflict-of-interest problem to trigger a duty to disclose when Mr. Saffarinia allegedly misrepresented to his supervisors his relationship with Person A. *Compare* Indictment, ECF No. 1 at 11 ¶ 44, *with Moore*, 446 F.3d at 678. Furthermore, the Indictment neither alleges that Mr. Saffarinia was the contracting officer, nor asserts that Mr. Saffarinia signed the "Conflict of Interest Acknowledgement and Nondisclosure Agreement." *See id*. On balance, the Court cannot find that Mr. Saffarinia had a legal duty to disclose any "actual or apparent conflicts of interest" given the lack of specificity in the Indictment.[7]

With respect to the fourth source—HUDAR—cited in the government's opposition brief, *see* 48 C.F.R. §§ 2403.101-2403.670, Section 2403.101 expressly provides that "[d]etailed rules which apply to the conduct of HUD employees are set forth

---

[7] The Court need not address Mr. Saffarinia's argument—that "[r]eliance upon a duty to disclose 'actual or apparent conflicts' renders 18 U.S.C. § 1001(a)(1) impermissibly vague[,]" Def.'s Reply, ECF No. 38 at 16—because the Court agrees with Mr. Saffarinia that the Indictment fails to allege a legal duty to disclose actual or apparent conflicts of interest.

in 5 CFR part 2635 and 5 CFR part 7501[,]" 48 C.F.R. § 2403.101;
*see also* 5 C.F.R. § 7501.101 ("Employees are required to comply
with 5 CFR part 2635, this part, and any additional rules of
conduct that the Department is authorized to issue."). Pursuant
to Section 2635.101, "[e]mployees shall disclose waste, fraud,
abuse, and corruption to appropriate authorities." 5 C.F.R.
§ 2635.101(b)(11); *see id*. § 2635.107. It is undisputed that
federal employees have this general duty to disclose. *See* Def.'s
Mem., ECF No. 27-1 at 16. That being said, this general federal
regulation to report wrongdoing and the general principles
embodied in 5 C.F.R. § 2635.101(b) are insufficient to impose a
legal duty to disclose. *E.g.*, *Safavian*, 528 F.3d at 964 (The
"relationship [of the strictures in 5 C.F.R. § 2635.101(b)] to
[the defendant's] duty under § 1001(a)(1) is tenuous at best.");
*White Eagle*, 721 F.3d at 1116–17 (holding that defendant's
failure to "disclose waste, fraud, and corruption" did not
support a concealment conviction under § 1001(a)(1) where the
defendant was "not charged with breaching the public trust or
failing to perform her duties as a public servant or government
employee.").

Finally, the government cites Chapter 2403 of the OCPO
Handbook—the fifth source—as further support for
Mr. Saffarinia's alleged legal duty to disclose. Gov't's Opp'n,

ECF No. 31 at 5 n.2.[8] But the government does not cite specific sections within that chapter. *See id*. Acknowledging that "the chapter cross-references and incorporates the financial disclosure requirements of OGE Form 278[,]" Mr. Saffarinia contends that "Chapter 2403 of the OCPO Handbook does not require disclosure of any longstanding financial relationships." Def.'s Reply, ECF No. 38 at 15.

Section 2403.101-3(a) of the OCPO Handbook provides, in relevant part, that "[a]ll HUD employees, including contracting, technical, and program personnel who have or will have access to source selection and/or contractor proposal information, must comply with the government-wide standards of ethical conduct rules published at 5 CFR Part 2635 and the HUD supplemental rules published at 5 CFR Part 7501." Def.'s Ex. A, ECF No. 38-2 at 48. Section 2403.101-3(b) of the OCPO Handbook states that "certain individuals with involvement in the acquisition process (*e.g.*, contracting personnel, [Contracting Officer's

---

[8] Mr. Saffarinia's contention—that certain versions of the OCPO Handbook located in the government's production "post-date" the alleged scheme to conceal from 2012 to 2016—is moot. *See* Def.'s Reply, ECF No. 38 at 14-15, 14 n.3. After filing his reply brief, Mr. Saffarinia informed the Court that his review of the voluminous discovery yielded excerpts of prior versions of the OCPO Handbook that were embedded in e-mails among HUD-OIG employees. *E.g.*, Def.'s Suppl. Decl. of Eric R. Nitz in Supp. of Def.'s Mot. to Dismiss, ECF No. 41 at 1-2; Def.'s Notice of Compliance, ECF No. 42 at 1; Def.'s Ex. 1, ECF No. 42-1 at 1-25; Def.'s Ex. 2, ECF No. 42-2 at 1-50; Def.'s Ex. 3, ECF No. 42-3 at 1-6.

Representative], [Source Selection Authority], and individuals serving on [Technical Evaluation Panels]) are required to disclose their financial interests[,]" and those disclosures must be made on OGE Form 278. *Id.*; *see also* Def.'s Ex. 1, ECF No. 42-1 at 24 (requiring "individuals involved in the procurement process" to "disclose their financial interests" on OGE Form 278). And Section 2403.101-70(c) of the OCPO Handbook, in relevant part, provides:

> All individuals who will have access to source selection information and/or proposals ([Individual Acquisition Plan] members with access to such information; [Technical Evaluation Panel] or other evaluation panel members) must complete [certain] disclosures and certifications . . . . [A]nnual filers must provide an update to their report if there have been any changes in their financial interests and/or liabilities as reported on their most recent financial disclosure report.

Def.'s Ex. A, ECF No. 38-2 at 49. The OCPO Handbook directed HUD employees, like Mr. Saffarinia, to the OGE Form 278. *See*, *e.g.*, Def.'s Ex. 1, ECF No. 42-1 at 24; Def.'s Ex. A, ECF No. 38-2 at 48. Having reviewed the sources and the OGE Form 278, the Court agrees with Mr. Saffarinia that the Indictment does not allege that OGE Form 278 unambiguously requires the disclosure of the alleged "longstanding financial relationship" with Person A. *See* Def.'s Reply, ECF No. 38 at 15.

Mr. Saffarinia relies on *Safavian* to support his argument that HUDRA's cross reference to 5 C.F.R. part 2635 does not

unambiguously require the disclosure of a longstanding financial relationship. *Id.* As Mr. Saffarinia correctly notes, the D.C. Circuit in *Safavian* rejected the government's argument that the standards of conduct in 5 C.F.R. part 2635 created a duty to disclose under § 1001(a)(1) where the defendant there availed himself of the voluntary system to seek ethics advice from the designated agency official. 528 F.3d at 964 (citing 5 C.F.R. § 2635.101); *id.* at 964 n.6 (5 C.F.R. § 2635.107); *see also* Def.'s Reply, ECF No. 38 at 15-16. The D.C. Circuit explained that "[i]t [was] not apparent how [the] voluntary system [of seeking advice from an agency ethics official], replicated throughout the government, impose[d] a duty on those seeking ethical advice to disclose—in the government's words—'all relevant information' upon pain of prosecution for violating § 1001(a)(1)." *Safavian*, 528 F.3d at 964 (quoting 5 C.F.R. § 2635.107(b)). The government is correct that this Court's prior ruling explained that Mr. Saffarinia's reliance on *Safavian* was misplaced because the alleged duty to disclose in this case arose from the EIGA, the OGE's regulations, and the OFE Form 278 rather than from the vague or general principles as in *Safavian*. *See* Gov't's Opp'n, ECF No. 31 at 5 (citing *Saffarinia*, 2019 WL 5086913, at *8).

As this Memorandum Opinion makes clear, however, the government's reliance on the sources in its opposition brief

other than the EIGA, the OGE's regulations, and the OFE Form 278 moves Mr. Saffarinia's situation closer to the vague, ill-defined situation in *Safavian*. *See* Gov't's Opp'n, ECF No. 31 at 5 n.2. Mr. Saffarinia correctly points out that this Court's prior ruling "said nothing of whether [the] allegations [in the Indictment] meet the elements of the crimes charged or, as a matter of law, require disclosure of allegedly concealed facts." Def.'s Reply, ECF No. 38 at 11. In denying Mr. Saffarinia's motion for a bill of particulars, this Court found that "Mr. Saffarinia has sufficient information through the voluminous discovery to permit him to conduct his *own* investigation . . . ." *Saffarinia*, 2019 WL 5086913, at *7 (citation and internal quotation marks omitted). While a defendant may challenge an indictment's specificity under Federal Rule of Criminal Procedure 7, *see United States v. Akinyoyenu*, 201 F. Supp. 3d 82, 85 (D.D.C. 2016), this Court did not reach the issue of whether the Indictment is sufficiently specific under Rule 12(b)(3)(B)(iii), or the question of whether the Indictment fails to state an offense. *See Saffarinia*, 2019 WL 5086913, at *7-*9.

A defendant can challenge an indictment on the grounds that it lacks specificity, *see* Fed. R. Crim. P. 12(b)(3)(B)(iii), but "the defendant must apprise the District Court of those particular portions of the indictment that are lacking in the

requisite specificity, and explain why, in the circumstances, greater specificity is required[,]" *United States v. Crowley*, 236 F.3d 104, 109 (2d Cir. 2000). Here, the Indictment alleges that Mr. Saffarinia "had a *financial relationship* with Person A that included tens of thousands of dollars in payments from Person A and an outstanding $80,000 promissory note on which payment was owed to Person A[.]" Indictment, ECF No. 1 at 4 ¶ 12 (emphasis added). The legal duty to disclose the $80,000 loan is specific information that meets the level of specificity as set forth in *Safavain*. *See* 528 F.3d at 964. The Indictment, however, does not specify the meaning of the phrase "financial relationship" other than alleging that it "include[s] payments from Person A to [Mr. Saffarinia] totaling at least $80,000." Indictment, ECF No. 1 at 4 ¶ 11. And the Indictment does not specify the legal duties to disclose the other concealed material facts: (1) Mr. Saffarinia's unauthorized disclosure of confidential information to Person A; (2) his efforts to steer government contracts to Person A and Company A; and (3) the existence of his actual or potential conflicts of interest. Mr. Saffarinia has made the requisite showing for greater specificity in the Indictment. *See Crowley*, 236 F.3d at 106.

The Court is bound by the language in the Indictment. *United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001). "Adherence to the language of the indictment is essential

because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." *Id.* at 1016. "[B]ut that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged." *United States v. Conlon*, 628 F.2d 150, 155 (D.C. Cir. 1980) (footnote omitted). Contrary to the government's assertion that Mr. Saffarinia had "unambiguous legal duties" to disclose his "longstanding financial relationship" with Person A, *see* Gov't's Opp'n, ECF No. 31 at 5, the Court cannot discern from the phrase—"financial relationship"—whether the EIGA, the OGE's regulations, and the OGE Form 278 unambiguously require disclosure of such information. *Cf. Crop Growers Corp.*, 954 F. Supp. at 347. Apart from Mr. Saffarinia's payments and loan from Person A, the Court cannot find that the Indictment sufficiently alleges that Mr. Saffarinia had a legal duty to disclose the nature and extent of his financial relationship with Person A, *see* Indictment, ECF No. 1 at 4 ¶ 11, or the other allegedly concealed facts, *see id.* at 2-3 ¶ 5, 3-4 ¶ 11, 4 ¶ 12, 5 ¶ 16.

Because of the lack of specificity as to the legal duty to disclose the four allegedly concealed facts in the Indictment, *see* Fed. R. Crim. P. 12(b)(3)(B)(iii), Count I is **DISMISSED WITHOUT PREJUDICE**. Accordingly, the Court **GRANTS IN PART**

Mr. Saffarinia's motion to dismiss.[9]

## 2. Obstruction Charges (Counts V – VII)

The Court next considers Mr. Saffarinia's arguments that
Counts V through VII should be dismissed because the Indictment
fails to allege that HUD and OGE's "review" of his completed OGE
Forms 278 constitutes an "investigation" or "matter" within the
meaning of § 1519. Def.'s Mem., ECF No. 27-1 at 22-30. Counts V
through VII charge that Mr. Saffarinia "with the intent to
impede, obstruct, and influence, and *in relation to and
contemplation of*, the *investigation* and *proper administration of
a matter* within the jurisdiction of a department and agency of
the United States, knowingly concealed, covered up, falsified,
and made false entries in a record, document, and tangible
object." Indictment, ECF No. 1 at 18 ¶ 78 (emphasis added).
These obstruction counts specifically allege that Mr. Saffarinia
caused his three separate OGE Forms 278 to be submitted with OGE
and HUD, and Mr. Saffarinia falsely stated in each form that he
had no reportable liabilities in excess of $10,000. *Id.*
According to the Indictment, however, Mr. Saffarinia received
payments and loans from Person A and his neighbor in excess of

---

[9] Pursuant to Federal Rule of Criminal Procedure 7(d),
Mr. Saffarinia moves to strike as surplusage certain "irrelevant
and prejudicial" allegations in Count I. Def.'s Mem., ECF No.
27-1 at 21 (citing Fed. R. Crim. P. 7(d)). In light of the
dismissal of Count I, the Court **DENIES AS MOOT** Mr. Saffarinia's
request.

$10,000. *Id.*

Chapter 73 of Title 18 of the United States Code, entitled "Obstruction of Justice," covers criminal liability for obstruction of justice. *See* 18 U.S.C. § 1519. Specifically, Section 1519 of that chapter, entitled "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

*Id.* This criminal statute has been applied in different contexts. *See, e.g.*, *Michel*, 2019 WL 5797669, at *11 (defendant charged with making a false entry in violation of 18 U.S.C. § 1519 by causing a political committee to make false statements in a form submitted to the Federal Election Commission); *United States v. Sanford Ltd.*, 841 F. Supp. 2d 309, 319 (D.D.C. 2012) (defendants allegedly made false entries in the oil record book of certain waste disposals in violation of 18 U.S.C. § 1519).[10]

---

[10] "The Court notes that 18 U.S.C. § 1001 is substantially similar to 18 U.S.C. § 1519." *United States v. Sanford Ltd.*, 880

According to Mr. Saffarinia, "[Section] 1519 does not unambiguously criminalize the alleged conduct" at issue and that he "lacked fair notice that the alleged conduct would be subsumed by § 1519." Def.'s Mem., ECF No. 27-1 at 10. Mr. Saffarinia makes three primary arguments. First, the "pertinent matter"—OGE's and HUD's review of his OGE Forms 278—falls outside of the purview of § 1519 because OGE's and HUD's "consideration" of the forms is not an "investigation . . . of any matter within the jurisdiction of any" federal department or agency. *Id.* at 23. In Mr. Saffarinia's view, his actions did not impede, obstruct, or influence an investigation by OGE because: (1) OGE did not review his forms, *id.* at 25; and (2) the United States Department of Justice ("DOJ") and a non-HUD Office of the

---

F. Supp. 2d 9, 17 (D.D.C. 2012). Section 1001, in relevant part, provides:

> (a) Except as otherwise provided in this section, whoever, in *any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States*, knowingly and willfully--
>> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
> shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

18 U.S.C. § 1001(a) (emphasis added).

Inspector General never initiated a formal investigation based on his OGE Forms 278, *id*. at 26. Next, OGE's and HUD's "consideration" of those forms does not qualify as the "proper administration of any matter within the jurisdiction of any" federal department or agency because the term "matter" is limited to "adversarial or adjudicative proceedings." *Id*. at 27. Finally, the text of § 1519 is ambiguous as to whether an agency's review of personnel forms can form the basis of the obstruction counts, and such ambiguity should be resolved in his favor under the rule of lenity. *Id*. at 30-34.

The government disagrees, arguing that: (1) Mr. Saffarinia urges this Court to "narrow artificially the scope of the statutory language [in § 1519] in a way that Congress did not," Gov't's Opp'n, ECF No. 31 at 14; (2) the legislative history supports a broad interpretation § 1519 that covers Mr. Saffarinia's acts, *id*. at 14-15, and several courts have applied § 1519 in cases involving reporting requirements as part of a federal agency's administrative functions, *id*. at 15-16; (3) § 1519 does not require an existing investigation and a defendant engages in obstructive conduct in the absence of an investigation, *id*. at 16-18; (4) case law and the statutory text make clear that receipt and review by HUD and OGE of the forms constitutes the proper administration of a matter within their jurisdiction, *id*. at 19-20; and (5) the rule of lenity does not

apply in this case because "there is no ambiguity in the plain text of the statute," *id*. at 23. The Court will address, in turn, each of these arguments.

### a. The Plain Language of 18 U.S.C. § 1519

The Court begins its analysis with the plain language of the statute. *United States v. Cordova*, 806 F.3d 1085, 1099 (D.C. Cir. 2015) ("In determining the 'plainness or ambiguity of statutory language' we refer to 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" (quoting *United States v. Wilson*, 290 F.3d 347, 353 (D.C. Cir. 2002))). The Court's task here is to "first 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) (quoting *Robinson v. Shell Oil Co*., 519 U.S. 337, 340 (1997)). If so, then the "inquiry ends and [the Court must] apply the statute's plain language." *Id*. If, however, the Court "find[s] the statutory language ambiguous, [the Court must] look beyond the text for other indicia of congressional intent." *Id*.

The rule of lenity "teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." *United States v. Davis*, 139 S. Ct. 2319, 2333 (2019). "But to invoke the rule of lenity, a court must

conclude that 'there is a *grievous* ambiguity or uncertainty in the statute.'" *United States v. Burwell*, 690 F.3d 500, 515 (D.C. Cir. 2012) (quoting *Muscarello v. United States*, 524 U.S. 125, 139 (1998)). "The simple existence of *some* statutory ambiguity, however, is not sufficient to warrant application of [the] rule [of lenity], for most statutes are ambiguous to some degree." *Muscarello*, 524 U.S. at 138 (emphasis added).

The Court is not persuaded by Mr. Saffarinia's arguments because his alleged obstructive conduct of submitting his false OGE Forms 278 to the relevant federal agencies is covered under the statute. *See* 18 U.S.C. § 1519. Indeed, the Supreme Court has held that § 1519 "covers conduct intended to impede *any* federal investigation or proceeding, including one not even on the verge of commencement." *Yates v. United States*, 135 S. Ct. 1074, 1087 (2015) (emphasis added); *see also United States v. Gray*, 642 F.3d 371, 379 (2d Cir. 2011) ("[Section] 1519 does not require the existence or likelihood of a federal investigation."). "By the plain terms of § 1519, knowledge of a pending federal investigation or proceeding is not an element of the obstruction crime." *Gray*, 642 F.3d at 378. And the Third Circuit has explained that "[t]he text of § 1519 requires only proof that [the defendant] knowingly falsified documents and did so with the intent to 'impede, obstruct, or influence the investigation or proper administration of any matter' that happens to be

within federal jurisdiction." *United States v. Moyer*, 674 F.3d 192, 209 (3d Cir. 2012). The Court rejects Mr. Saffarinia's argument that he did not act "'in contemplation of' a true investigation" by HUD and OGE, Def.'s Mem., ECF No. 27-1 at 26, because it goes against the weight of the authority.

Next, Mr. Saffarinia's argument—that HUD's and OGE's review of his OGE Forms 278 does not qualify as an "investigation" or the "proper administration of a matter within the jurisdiction of an agency or department," Def.'s Mem., ECF No. 27-1 at 24-30—is unavailing. While it is true that § 1519 does not define the word "investigation" or the phrase "proper administration of any matter," *id.* at 31, "Congress is presumed to use words in the common, ordinary meaning absent contrary indication," *United States v. Hite*, 769 F.3d 1154, 1161 (D.C. Cir. 2014) (relying on Black's Law Dictionary definitions). With respect to the term "investigation," Mr. Saffarinia asserts that HUD's and OGE's consideration of his OGE Forms 278 does not meet the "threshold" as defined in Black's Law Dictionary: "An 'investigation' is the 'activity of trying to find out the truth about something, such as a crime, accident, or historical issue.'" Def.'s Mem., ECF No. 27-1 at 24 (quoting Black's Law Dictionary 953 (10th ed. 2014)).

The term "investigation" has a broad meaning. It has been commonly defined as:

> The activity of trying to find out the truth
> about something, such as a crime, accident, or
> historical issue; esp[ecially], either an
> authoritative inquiry into certain facts, as
> by a legislative committee, or a systematic
> examination of some intellectual problem or
> empirical question, as by mathematical
> treatment or use of the scientific method.

*Investigation*, Black's Law Dictionary (11th ed. 2019).[11] The word

"especially" indicates that the list of examples in the

definition is non-exhaustive. *See In re Foothills Texas, Inc.*,

408 B.R. 573, 579 n.18 (Bankr. D. Del. 2009) ("The use of the

word especially makes the list of examples illustrative rather

than exclusive."). Here, Mr. Saffarinia's reliance on one of the

examples in the definition of investigation—that an

"investigation" involves "authoritative *inquiry* into certain

facts," Def.'s Mem., ECF No. 24 at 24 (emphasis added)—undercuts

his argument that the agency's "limited review" is not akin to

an investigation, *see id*. Like the term "investigation," the

term "inquiry" has been broadly defined. *See Inquiry*, Black's

Law Dictionary (11th ed. 2019) (defining "inquiry" as "[a]

question someone asks to elicit information"). And the term

"review" means "[c]onsideration, inspection, or reexamination of

---

[11] The word "investigation" has also been defined as "[t]he
action or process of investigating a person or thing (in various
senses of the verb); examination; inquiry; research; *spec*.
scientific examination, academic research; formal inquiry into a
crime, allegation, someone's conduct, etc." *Investigation*,
Oxford English Dictionary (3d ed. 2019).

a subject or thing." *Review*, Black's Law Dictionary (11th ed. 2019). It, too, has a broad meaning. *See id.*

It follows that OGE could have conducted an authoritative inquiry into certain facts. *See* Def.'s Mem., ECF No. 24 at 24. It is undisputed that OGE has the authority to "monitor[] and investigat[e] compliance with the public financial disclosure requirements," 5 U.S.C. app. § 402(b)(3), and "conduct investigations" arising from that compliance or noncompliance, *id.* § 402(f)(1)(B)(i). Acknowledging that HUD's designated agency ethics official or the Secretary "must ensure the [OGE Forms 278] are 'reviewed' within sixty days after they are filed," Def.'s Mem., ECF No. 27-1 at 24 (citing 5. U.S.C. app. § 106(a)(1); 5 C.F.R. § 2634.605(a)), Mr. Saffarinia contends that the agency's reviewer may request additional information from the federal employee, but the reviewer lacks the authority to conduct an investigation, such as issuing "subpoenas, tak[ing] interviews, compel[ling] testimony, or otherwise gather[ing] information through other means," *id.* The Court agrees with the government that Mr. Saffarinia's attempt to draw a distinction between an agency's "review" and a "formal investigation" is inconsequential. *See* Def.'s Mem., ECF No. 27-1 at 24; *see also* Gov't's Opp'n, ECF No. 31 at 16 (arguing that "[t]he defendant's argument is a distinction without a difference"). The ordinary meaning of the word "investigation"

supports the government's interpretation that OGE's and HUD's review or consideration of his OGE Forms 278 constitutes an investigation within the meaning of § 1519. *See* Gov't's Opp'n, ECF No. 31 at 16.

Mr. Saffarinia contends that OGE did not review his OGE Forms 278. *See* Def.'s Mem., ECF No. 27-1 at 25-26. The government disputes Mr. Saffarinia's contention. Gov't's Opp'n, ECF No. 31 at 19. It is possible that HUD could have referred to OGE Mr. Saffarinia's OGE Forms 278 following HUD's initial review of those forms. *See* 5 C.F.R. § 2638.501 (agency has the "primary responsibility to ensure compliance with the ethics law and regulations"); *see also* 5 U.S.C. § app. 4 § 402(b)(5) (OGE Director's responsibilities include "monitoring and investigating individual and agency compliance with any additional financial reporting and internal review requirements established by law for the executive branch"). Indeed, "the results of the agency's investigations and its own conclusions about whether ethics violations actually occurred are not the final word if the OGE finds that more needs to be done." *Defs. of Wildlife*, 314 F. Supp. 2d at 19. "[T]he OGE Director may initiate an investigation to determine whether a violation has occurred and '[o]rdinarily a determination to proceed will be *based upon* an agency report of investigation[.]'" *Id*. at 20 (citation omitted). And Mr. Saffarinia's assertion—that HUD had

56

to refer any investigation to the Integrity Committee for the Council of the Inspector General on Integrity and Efficiency for an investigation by another inspector general, *see* Def.'s Mem., ECF No. 27-1 at 26—does not eliminate the possibility that HUD either conducted a review of his forms in the first instance or reviewed those forms to refer him to the appropriate officials, *see* 5 U.S.C. § app. 3 § 11(d)(5) (stating that "allegation[s] of wrongdoing [against a staff member of the agency's Office of Inspector General] shall be reviewed and referred to [DOJ] or the Office of Special Counsel for investigation, or to the Integrity Committee for review"). The Court therefore finds that the Indictment sufficiently alleges the review of his OGE Forms 278 falls within the meaning of § 1519.

As to the issue of whether the review of Mr. Saffarinia's OGE Forms 278 qualifies as the "proper administration of any matter with the jurisdiction" of a federal agency or department, Mr. Saffarinia narrowly interprets that phrase to mean that the "'matter' whose proper administration a defendant intends to impede, obstruct, or influence is limited to *adversarial* or *adjudicative proceedings*." Def.'s Mem., ECF No. 27-1 at 27 (emphasis added). The government responds that Mr. Saffarinia's interpretation is unsupported because Congress placed no such limits in § 1519's language. Gov't's Opp'n, ECF No. 31 at 19-20.

To recap, a defendant violates § 1519 when he "knowingly . . . conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object" and the defendant does so "with the intent to impede, obstruct, or influence the investigation or *proper administration of any matter within the jurisdiction of any department or agency of the United States* or any case filed under title 11, or in relation to or contemplation of any such matter or case." 18 U.S.C. § 1519 (emphasis added). The term "matter" commonly means "[a] subject under consideration, esp[ecially] involving a dispute or litigation." *Matter*, Black's Law Dictionary (11th ed. 2019); *see also Matter*, Oxford English Dictionary (3d ed. 1991) (defining "matter" as "[a] subject of contention, dispute, litigation, etc.").

Relying on the example provided in Black's Law Dictionary, Mr. Saffarinia argues that the Court should narrowly interpret the word "matter" in § 1519. *See* Def.'s Mem., ECF No. 27-1 at 28 (citing Black's Law Dictionary 1126 (10th ed. 2014)); *see also* Def.'s Reply, ECF No. 38 at 24 ("The final clause of that definition . . . therefore is consistent with Mr. Saffarinia's proposed construction limiting § 1519's 'any matter' clause to a specific adjudicative or adversarial adjudication."). As previously noted, however, Mr. Saffarinia ignores that the word "especially" after a "subject under consideration" in the

definition of "matter," which provides a non-exhaustive list of examples. *See* Def.'s Mem., ECF No. 27-1 at 28. The government argues—and the Court agrees—that "[t]he receipt and review of [Mr. Saffarinia's] Forms 278 clearly constitute 'a subject under consideration' by HUD and OGE" given the common meaning of the word "matter." Gov't's Opp'n, ECF No. 31 at 21.

Mr. Saffarinia's next argument—that the word "matter" should be limited to adversarial proceedings based on § 1519's placement of the word "matter" between "a prohibition on obstructing the investigation of any matter and a prohibition on obstructing any case filed under the bankruptcy code," Def.'s Reply, ECF No. 38 at 23—is unavailing. In Mr. Saffarinia's view, the application of *noscitur a sociis*, a canon of statutory construction, should result in the phrase "proper administration of any matter" being "cabined to specific adversarial adjudicative proceedings, such as formal administrative proceedings before an agency." Def.'s Mem., ECF No. 27-1 at 28. Mr. Saffarinia contends that the words surrounding "proper administration of any matter"—"[1] investigation . . . [2] any case filed under title 11 [Bankruptcy Code]," 18 U.S.C. § 1519— should be "cabin[ed]" to only those proceedings. Def.'s Mem., ECF No. 27-1 at 27 (quoting *Yates*, 135 S. Ct. at 1085). Mr. Saffarinia relies on the title of § 1519 that includes "Federal investigations" and "bankruptcy" to support his

position that "matter" relates to "efforts to interfere with *specific* investigative or adjudicative proceeding involving a court, an agency, or Congress." *Id.* at 28 (footnote omitted). In response, the government contends that Mr. Saffarinia's arguments are an attempt to introduce ambiguity into § 1519's plain language, Gov't's Opp'n, ECF No. 31 at 20, and the government argues that "[t]he receipt and review of [Mr. Saffarinia's] Forms 278 clearly constitute 'a subject under consideration' by HUD and OGE," *id.* at 21.

In Latin, *noscitur a sociis* means "a word is known by the company it keeps." *Yates*, 135 S. Ct. at 1085. The Supreme Court has recognized that "[t]o choose between [the] competing definitions, [the Court should] look to the context in which the words appear." *McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016). Courts employ "the familiar interpretive canon *noscitur a sociis*" to "avoid the giving of unintended breadth to the Acts of Congress." *Id.* (citation omitted). In applying this canon to a statute that made it unlawful to "make a harangue or oration" in the Supreme Court's building and grounds, the D.C. Circuit explained that "we are interpreting a statute, not restating a dictionary. Our search here is not for every facet of 'harangue' or 'oration,' but their meaning within the statute at issue." *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017).

In this case, the parties agree with the main clause in the definition of "matter," as defined by Black's Law Dictionary: "a subject under consideration." *E.g.*, *Matter*, Black's Law Dictionary (11th ed. 2019); Def.'s Mem., ECF No. 27-1 at 28 (quoting Black's Law Dictionary 1126 (10th ed. 2014)); Gov't's Opp'n, ECF No. 31 at 21 (same). The Court will assume, however, that Mr. Saffarinia's reliance on the example of "matter"— "involving a dispute or litigation; case"—is the narrower definition that competes with the broader definition of "subject under consideration." *See* Def.'s Mem., ECF No. 27-1 at 28. Given the broad meaning of the word "matter," however, the use of "matter" in § 1519 suggests that an individual is criminally liable if he knowingly falsifies any record, document, or tangible object with the intent to impede, obstruct, or influence the proper administration of *any matter* within the jurisdiction of any federal department or agency. *See* 18 U.S.C. § 1519.

To support its position, the government relies on the Eleventh Circuit's decision in *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008). Gov't's Opp'n, ECF No. 31 at 15. There, a jury convicted the defendant for knowingly making a false statement in a police incident report with the intent to impede, obstruct, or influence an investigation by the Federal Bureau of Investigation ("FBI"), in violation of § 1519. *Hunt*,

526 F.3d at 741. The Eleventh Circuit held that § 1519 was not vague and "[b]y its plain text, the statute placed [the defendant] on notice his conduct was unlawful" because "[a] person of ordinary intelligence would understand a police report to be a 'record' or 'document,' and would also read the language 'any matter within the jurisdiction of [a] department . . . of the United States' to include an FBI investigation." *Id*. at 743. Here, the plain text of § 1519 put Mr. Saffarinia on notice that his alleged obstructive conduct was unlawful. *See id*.

Mr. Saffarinia argues that *Hunt* is distinguishable because the Eleventh Circuit did not "consider[] whether the statutory meaning of 'proper administration of any matter' was limited to specific adjudicative or adversarial proceedings under the applicable canons of statutory construction." Def.'s Reply, ECF No. 38 at 25. But Mr. Saffarinia does not dispute that the Eleventh Circuit has expressly recognized that the plain language in § 1519 is "broad." *See Hunt*, 526 F.3d at 744. The government correctly points out that the Eleventh Circuit noted that "the statute's text 'bears no hint of any limiting principle cabining § 1519 to [the] corporate fraud cases' that prompted its passage." Gov't's Opp'n, ECF No. 31 at 15 (quoting *Hunt*, 526 F.3d at 744). Indeed, the Eleventh Circuit explained that "Congress is free to pass laws with language covering areas well beyond the particular crisis *du jour* that initially

prompted legislative action." *Hunt*, 526 F.3d at 744 ("When the text of a statute is plain, . . . [the Court] need not concern [itself] with contrary intent or purpose revealed by the legislative history.").[12]

Mr. Saffarinia correctly notes that *Hunt* did not address the issue of whether the phrase "proper administration of any matter" was limited to adjudicative or adversarial proceedings. *See* Def.'s Reply, ECF No. 38 at 25. And Mr. Saffarinia argues that "Congress in § 1519 defined a crime of much more narrow scope than in § 1001" because the "language in § 1001—which unlike § 1519 is not cabined by any surrounding text—reaches

---

[12] Mr. Saffarinia relies on *Marinello v. United States*, 138 S. Ct. 1101, 1107, 1110 (2018), for the proposition that the falsification of public disclosure forms should not constitute obstruction of justice under 18. U.S.C. § 1519 because the Supreme Court in *Marinello* rejected the "notion that the 'routine processing' of [tax returns] 'carried out in the ordinary course' can be the types of 'matters' that fall within the scope of the statute." Def.'s Mem., ECF No. 27-1 at 32. In *Marinello*, the Supreme Court held that "to secure a conviction under [26 U.S.C. § 7212(a)'s] Omnibus Clause, the Government must show (among other things) that there is a 'nexus' between the defendant's conduct and a particular administrative proceeding, such as an investigation, an audit, or other targeted administrative action. That nexus requires a 'relationship in time, causation, or logic with the [administrative] proceeding.'" 138 S. Ct. at 1109 (citation omitted). *Marinello* is inapposite. *See United States v. Luminaire Envtl. & Techs., Inc.*, 358 F. Supp. 3d 829, 833–34 (D. Minn. 2018) (denying defendant's argument that *Marinello* warrants dismissal of § 1519 charges because "[t]he language of the statute in *Marinello*, 26 U.S.C. § 7212(a), employs much broader language than that of 18 U.S.C. § 1519"). "*Marinello* simply does not plow new ground." *Id*. at 834.

every conceivable aspect of government operations." Def.'s Mem.,
ECF No. 27-1 at 29. By not responding to this argument, *see*
Gov't's Opp'n, ECF No. 31 at 13-26, the government has conceded
it, *see* Def.'s Reply, ECF No. 38 at 24. Assuming, without
deciding, that there exists some ambiguity in § 1519 with
respect to the phrase "proper administration of any matter," *see*
*Muscarello*, 524 U.S. at 138, the Court will look beyond the
statutory language, *see Villanueva-Sotelo*, 515 F.3d at 1237.

### b. Legislative History of 18 U.S.C. § 1519

The Court next considers the legislative history to discern
the meaning of "proper administration of any matter" in § 1519.
*See id.* Congress enacted § 1519 "as part of the Sarbanes-Oxley
Act, which was targeted at corporate fraud and executive
malfeasance." *Hunt*, 526 F.3d at 744. The report from the Senate
Judiciary Committee, in pertinent part, provides:

> Section 1519 is meant to apply broadly to any
> acts to destroy or fabricate physical evidence
> so long as they are done with the intent to
> obstruct, impede or influence the
> investigation or proper administration of any
> matter, and such matter is within the
> jurisdiction of an agency of the United
> States, or such acts done either in relation
> to or in contemplation of such a matter or
> investigation. This statute is specifically
> meant not to include any technical
> requirement, which some courts have read into
> other obstruction of justice statutes, to tie
> the obstructive conduct to a pending or
> imminent proceeding or matter. It is also
> sufficient that the act is done "in
> contemplation" of or in relation to a matter

or investigation. It is also meant to do away
with the distinctions, which some courts have
read into obstruction statutes, between court
proceedings, investigations, regulatory or
administrative proceedings (whether formal or
not), and less formal government inquiries,
regardless of their title. Destroying or
falsifying documents to obstruct any of these
types of matters or investigations, which in
fact are proved to be within the jurisdiction
of any federal agency are covered by this
statute.

S. Rep. No. 107-146, 14-15 (2002) (footnote omitted). In the

"Additional Views" section, eight U.S. Senators "clarif[ied]

[their] intent and understanding with regard to specific

provisions of [the "Corporate and Criminal Fraud Accountability

Act of 2002,"] S. 2010," including § 1519. *Id*. at 27. Those

senators explained:

We recognize that section 1519 overlaps with
a number of existing obstruction of justice
statutes, but we also believe it captures a
small category of criminal acts which are not
currently covered under existing laws–for
example, acts of destruction committed by an
individual acting alone and with the intent to
obstruct a future criminal investigation.

We have voiced our concern that section 1519,
and in particular, the phrase "or proper
administration of any matter within the
jurisdiction of any department or agency of
the United States" could be interpreted more
broadly than we intend. In our view, section
1519 should be used to prosecute only those
individuals who destroy evidence with the
specific intent to impede or obstruct a
pending or future criminal investigation, a
formal administrative proceeding, or
bankruptcy case. It should not cover the
destruction of documents in the ordinary

> course of business, even where the individual
> may have reason to believe that the documents
> may tangentially relate to some future matter
> within the conceivable jurisdiction of an arm
> of the federal bureaucracy.

*Id.*

Here, it is undisputed that the Senate Judiciary Committee's report "asserts that § 1519 reaches 'less formal government inquiries' as well as 'destroying, altering, or falsifying documents to obstruct any government function.'" Def.'s Mem., ECF No. 27-1 at 31 (quoting S. Rep. No. 107-146, at 15). Nonetheless, Mr. Saffarinia argues that the legislative history demonstrates there is ambiguity in § 1519 due to the submission of the "Additional Views," *id.* (citing S. Rep. No. 107-146, at 26-31), even though those senators agreed that § 1519 "captures a small category of criminal acts which are not currently covered under existing laws," *id.* (quoting S. Rep. No. 107-146, at 27). Mr. Saffarinia emphasizes the view of the eight senators that Section 1519 "should be used to prosecute only those individuals who destroy evidence with the specific intent to impede or obstruct a pending or future criminal investigation, a formal administrative proceeding, or bankruptcy case." *Id.* (quoting S. Rep. No. 107-146, at 27).

The Court is not persuaded by Mr. Saffarinia's arguments. The government contends—and the Court agrees—that "Congress referred to the 'proper administration of any matter' and

supplied a legislative history that indicated a contemplation of the broad meaning of that phrase, and its adoption." Gov't's Opp'n, ECF No. 31 at 22. Mr. Saffarinia's proposed construction of § 1519 is inconsistent with the Senate Judiciary Committee's report because the report makes clear that Section 1519 is "meant to do away with the distinctions, which some courts have read into obstruction statutes, between court proceedings, investigations, regulatory or administrative proceedings (whether formal or not), and *less formal government inquiries*, *regardless of their title*." S. Rep. No. 107-146, 14-15 (emphasis added). In other words, the Senate Judiciary Committee's report indicates that Section 1519 does not draw a distinction between a formal proceeding and a less formal government inquiry. *See id*.

Mr. Saffarinia's narrow interpretation of § 1519 is supported, in part, by the "Additional Views" of the eight senators. *See* S. Rep. 107-146, at 27. But a defendant "cannot avoid the result compelled by the plain language by selectively citing legislative history." *Hunt*, 526 F.3d at 744. The Supreme Court has accorded weight to *sponsoring* legislators' "Additional Views." *See Garrett v. United States*, 471 U.S. 773, 783-85 (1985). None of the eight senators were the original co-sponsors of S. 2010. *Compare* S. Rep. 107-146, at 2 (stating that Senator Patrick Leahy, with Senators Daschle, Durbin, and Harkin were

the original co-sponsors), *with id*. at 26 ("Additional Views of Senators Hatch, Thurmond, Grassley, Kyl, DeWine, Sessions, Brownback, and McConnell"). Furthermore, "[i]t is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute [the Court] do[es] not inquire what the legislature meant; [the Court] ask[s] only what the statute means." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) (citation and internal quotation marks omitted).

Having carefully reviewed the plain language of § 1519, the contextual meaning of the word "matter," and the legislative history, the Court declines to adopt Mr. Saffarinia's interpretation of "proper administration of any matter" in § 1519 even when the phrase is interpreted using the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted). The Court concludes that the statutory text is broad enough to cover Mr. Saffarinia's alleged obstructive conduct, *see* 18 U.S.C. § 1519, and "imposing a requirement that the *matter* develop into a formal investigation ignores the plain meaning of the statute," *United States v. Kun Yun Jho*, 465 F. Supp. 2d 618, 636 (E.D. Tex. 2006) (emphasis added), *rev'd on other grounds*, 534 F.3d 398 (5th Cir. 2008). Because the Court

is not persuaded that Mr. Saffarinia's proposed construction of
§ 1519 renders the statute grievously ambiguous, *see* Def.'s
Mem., ECF No. 27-1 at 23-30, and the plain language of § 1519
supports a broad interpretation of the words "investigation" and
"matter," the Court therefore finds that the rule of lenity is
inapplicable in this case, *see Burwell*, 690 F.3d at 515.
Accordingly, the Court **DENIES** Mr. Saffarinia's motion to dismiss
with respect to Counts V through VII.

### 3. Whether the Grand Jury Was Improperly Charged

Mr. Saffarinia seeks dismissal of the Indictment in its
entirety on the ground that there is a "likelihood that the
grand jury proceedings were infected by legal error." Def.'s
Mem., ECF No. 27-1 at 34 (citing Fed. R. Crim. P. 12(b)). In the
alternative, Mr. Saffarinia requests that "the Court order the
government to produce the grand jury minutes so that the
adequacy of the government's instruction can be assessed." *Id*.
at 35. The government disagrees, arguing that Mr. Saffarinia's
"incorrect assumption that the grand jury received improper
instructions is pure conjecture and is insufficient to warrant
dismissal of the [I]ndictment." Gov't's Opp'n, ECF No. 31 at 27.

A criminal defendant may move to dismiss an indictment
prior to trial based on "an error in the grand-jury proceeding,"
Fed. R. Crim. P. 12(b)(3)(A)(v), but the defendant seeking such
relief "faces a very heavy burden," *United States v. Trie*, 23 F.

Supp. 2d 55, 61 (D.D.C. 1998). Grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. Mechanik*, 475 U.S. 66, 75 (1986).

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). In other words, "dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.* at 256 (citation and internal quotation marks omitted). "A great deal more than mere speculation that a grand jury has been improperly instructed is required to satisfy this standard." *Trie*, 23 F. Supp. 2d at 61.

Here, dismissal of the entire Indictment is unwarranted. Because the Court has already dismissed without prejudice Count I, the Court will consider Mr. Saffarinia's arguments as to Counts V through VII. Mr. Saffarinia contends that the grand jury was likely not properly charged with the "specific 'matter' or 'investigation' at issue" for the obstruction charges under § 1519, which "underscores that the instructions concerning this

element *may* have been defective . . . ." Def.'s Mem., ECF No. 27-1 at 35 (emphasis added). Mr. Saffarinia argues that "the government likely put before the grand jury the same faulty argument concerning the breadth of § 1519 that it now advances in opposing Mr. Saffarinia's motion to dismiss." Def.'s Reply, ECF No. 38 at 30-31. The government responds that the Indictment "contains sufficient and proper allegations regarding the essential elements," and Mr. Saffarinia's "incorrect assumption" is "pure conjecture." Gov't's Opp'n, ECF No. 31 at 27.

The Court agrees with the government that Counts V through VII sufficiently allege the essential elements. *See Costello v. United States*, 350 U.S. 359, 363 (1956) ("[A]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is sufficient to call for trial on the merits."). Mr. Saffarinia does not explain how any errors, if proven, would not have been harmless, *see United States v. Akinyoyenu*, 199 F. Supp. 3d 34, 36 (D.D.C. 2016) (noting that "the age-old rule of harmless error applies" in the context of errors in the grand-jury proceeding), and Mr. Saffarinia fails to demonstrate that he was prejudiced by the alleged errors, *see Bank of Nova Scotia*, 487 U.S. at 254. The Court therefore finds that none of the alleged deficiencies "may have had 'substantial influence' on the outcome of the proceeding," *id.* at 256 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Mr. Saffarinia fails to demonstrate a "particularized need" for the grand jury minutes. *United States v. Espy*, 23 F. Supp. 2d 1, 10 (D.D.C. 1998). Under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), the Court may authorize disclosure of grand jury materials to a defendant "who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury. Fed. R. Crim. P. 6(e)(3)(E)(ii); *see also United States v. Naegele*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007). The defendant must "demonstrate[ ] a 'particularized need' or 'compelling necessity' for the [material]." *United States v. Wilkerson*, 656 F. Supp. 2d 22, 34 (D.D.C. 2009) (quoting *Smith v. United States*, 423 U.S. 1303, 1304 (1975)). Mr. Saffarinia has failed to do so.

Mr. Saffarinia's speculation that the government may have improperly instructed the grand jury on the specific "investigation" and "matter" does not warrant disclosure of the grand jury minutes. *See* Def.'s Mem., ECF No. 27-1 at 35; *see also Trie*, 23 F. Supp. 2d at 62 ("But the mere suspicion that the grand jury may not have been properly instructed with respect to the legal definition of contribution is insufficient to establish that [the defendant] is entitled either to dismissal of the indictment or to disclosure of grand jury materials."). Neither does mere suspicion warrant the Court's *in camera* review of the charge. *See* Def.'s Reply, ECF No. 38 at 31.

Accordingly, the Court **DENIES** Mr. Saffarinia's motion to dismiss the Indictment in its entirety for an alleged error in the grand jury proceedings, or in the alternative, for disclosure of the grand jury minutes and the Court's *in camera* review of the charge.

### B. Motion for *Brady* Material

Mr. Saffarinia seeks an Order directing the government to: (1) identify the *Brady* material in its voluminous production; and (2) disclose whether it possesses certain categories of information and whether such information has been reviewed for *Brady* material. Def.'s Brady Mem., ECF No. 28-1 at 6, 11. Mr. Saffarinia requests that the government identify any known *Brady* material "based on its existing knowledge of the documents collected during the course of its three-year investigation." Def.'s Reply, ECF No. 37 at 2. The government opposes Mr. Saffarinia's *Brady* motion, arguing that "there is no support for such a request, nor is there justification to expand the government's discovery obligations beyond what this Court has already articulated in its Standing [*Brady*] Order." Gov't's Opp'n, ECF No. 29 at 5. For the reasons articulated below, the government must specifically identify any known *Brady* material in its production.

Before turning to the parties' arguments, the Court will summarize the government's productions and Mr. Saffarinia's *Brady* requests.

## 1. The Government's Productions

On June 28, 2019, this Court issued its Standing *Brady* Order directing the government to produce to Mr. Saffarinia in a timely manner any evidence in its possession that is favorable to Mr. Saffarinia and material either to his guilt or punishment. Order, ECF No. 11 at 2. The Court then granted the parties' consent motion for a Protective Order governing discovery pursuant to Federal Rule of Criminal Procedure 16(d). *See* Min. Order of June 28, 2019. Between June and August 2019, the government made five productions of documents to Mr. Saffarinia, which included, among other things, nearly all of the FBI's investigative case file, interview reports (*i.e.* FD-302s), agent notes, and witnesses' statements pursuant to the Jencks Act, 18 U.S.C. § 3500. *See, e.g.*, *Saffarinia*, 2019 WL 5086913, at *3-*5; Gov't's Opp'n, ECF No. 29 at 2. A large portion of the electronic data consists of electronic communications, including 264,800 e-mails and over 223,000 documents from the FBI's case file, that span roughly a four-year period. Def.'s *Brady* Mem., ECF No. 28-1 at 2. And the government's production includes hard drives from two different computers allegedly owned by Person B, which contain 394

gigabytes of data. *Id.*[13] The discovery here, consisting of more than one million records and 3.5 million pages of documents, is massive. *Saffarinia*, 2019 WL 5086913, at *4.

The government produced the documents to Mr. Saffarinia with production logs, Bates-stamping, and metadata in an electronic and searchable format that is accessible through "Relativity," an electronic database. *See* Def.'s Brady Mem., ECF No. 28-1 at 2; *see also* Gov't's Opp'n, ECF No. 29 at 2. The government included a cover letter with each production and "a basic, one to two page chart" summarizing the Bates-stamped numbers covered in each production. Gov't's Opp'n, ECF No. 29 at 2. And the government represents that it explained its theory of the case to Mr. Saffarinia and defense counsel at two reverse proffer sessions. *Id.*

According to the government, it "remains aware of its obligations under applicable case law, and cognizant of the Court's Standing [*Brady*] Order on Discovery, and will continue to comply with these obligations." Gov't's Opp'n, ECF No. 29 at

---

[13] Computers and smartphones can store warehouses of information. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 394 (2014) ("The current top-selling smart phone has a standard capacity of 16 gigabytes (and is available with up to 64 gigabytes). Sixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos."); *United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) ("The average 400-gigabyte laptop hard drive can store over 200 million pages—the equivalent of five floors of a typical academic library.").

11. The government maintains that it "has assisted and will continue to assist defense counsel with discovery-related issues, but it is not the government's obligation to also independently comb through the discovery to identify materials that [Mr. Saffarinia] may find valuable in building his case." *Id.* The government notes that Mr. Saffarinia can conduct searches for certain information using the Relativity platform, and those searches will yield the requested information and documents. *Id.* at 4-5; *see also id* at 2 n.1. The government points out that "[t]he electronic indices containing the metadata for the entire electronic production can be searched and sorted by document type, e-mail senders and receivers, date, and subject line, and can be keyword searched in either the searchable, load-ready format, or in the [Microsoft] Excel format, both of which have been provided to [Mr. Saffarinia]." *Id.* at 8. The government highlights a "hot documents" binder containing e-mails, forms, and records that it provided to Mr. Saffarinia, which purportedly outlines the government's case. *Id.* at 7. And the government notes that the production logs are "the loadable, electronic .dat files that contain all of the metadata and underlying information." *Id.* at 2 n.1.

Characterizing the government's efforts as "simply dumping millions of pages on Mr. Saffarinia along with barebones production logs," Mr. Saffarinia contends that "[n]owhere in the

metadata or production logs does the government designate anything as *Brady* material, much less direct the defense to locations where *Brady* might be found." Def.'s Brady Mem., ECF No. 28-1 at 2. Mr. Saffarinia does not dispute that the government has turned over "electronic data totaling approximately 3.5 million pages." *Id*. Mr. Saffarinia, however, takes issue with the government's characterizations of its productions. *See id*. at 2-3.

Mr. Saffarinia contends that the government's production logs are "skeletal" because those "logs only identify the agency from which the documents originated—*e.g.*, 'Relativity Production of documents from HUD—OIG' or 'FBI Case File'—the date produced, and the beginning and ending Bates number." *Id*. at 3. Mr. Saffarinia points out that the "Relativity Production of documents from HUD—OIG" has a "Bates range containing over two million pages." *Id*. After the government provided defense counsel with "automatically populated metadata for each document which includes information such as filepaths and filenames," Mr. Saffarinia acknowledges that the government exported the metadata to Microsoft Excel spreadsheets, but the government provided the spreadsheets to him after he requested "more detailed production logs." *Id*. Mr. Saffarinia notes that "those spreadsheets are themselves voluminous, spanning nine separate [E]xcel workbooks and collectively consisting of over 324

columns of data and 1,247,039 rows." *Id.* With respect to the "hot documents" binder of key documents which the government referred to during a reverse proffer, Mr. Saffarinia points out that the government provided the binder to him after five requests for it. *Id.* Mr. Saffarinia argues that the government has never represented that the binder includes any *Brady* material. *Id.* at 4.

## 2. Mr. Saffarinia's *Brady* Requests

Given the voluminous discovery in this case, Mr. Saffarinia made specific requests to the government for *Brady* material on June 26, 2019. *Id.; see generally* Letter from Justin Shur, MoloLamken LLP, to Edward Sullivan, U.S. Dep't of Justice (June 26, 2019), Def.'s Ex. 3, ECF No. 28-5 at 2-6.[14] On July 8, 2019, the parties appeared before the Court for a status hearing, and Mr. Saffarinia requested that the Court order the government to specifically identify *Brady* information: "[T]o the extent that there is *Brady* information that has been identified,

---

[14] Mr. Saffarinia requested: "agreements/deals with government witnesses, payments to witnesses, criminal history of witnesses, personnel files of testifying law enforcement agents or other agents of the government; evidence of misconduct by government witnesses, contradictory inconsistent statements, inconsistent notes from prosecutors or agents, and expert reports inconsistent with the government's theory of the case." Def.'s Brady Mem., ECF No. 28-1 at 4. Mr. Saffarinia also requested "all statements, interviews, and/or testimony, written or oral, of certain government witnesses as well as the substance of attorney proffers concerning the same." *Id.*

[Mr. Saffarinia] just ask[s] that that be sort of specifically identified within the volume of discovery that's been produced." Status Hr'g Tr. (July 8, 2019), ECF No. 17 at 6. In response to the Court's question if the government had any problems with Mr. Saffarinia's *Brady* request, the government stated that "[b]ecause it is a very voluminous production . . . I think I am hesitant to say [we will] identify all the *Brady* by going through 1.2 million documents." *Id*. The government also stated that "we will do our best to identify in 302 reports" and "we have tried to identify exculpatory information with respect to some of the interviews and inculpatory information." *Id*. at 6-7. According to Mr. Saffarinia, "the government **has not identified a single instance of exculpatory information** from among the 302s." Def.'s Reply, ECF No. 37 at 8.

On October 11, 2019, Mr. Saffarinia sent the government an e-mail to follow up on his initial request for the government to specifically identify *Brady* material, and the government responded that it "has fully met its obligations." Def.'s Brady Mem., ECF No. 28-1 at 5. On October 15, 2019, Mr. Saffarinia asked the government to: (1) identify the Bates numbers for any notes or summaries of material, exculpatory information learned from the attorney proffers for its witnesses; and (2) "to clarify whether the government had no such materials or whether the government possessed them but viewed them as non-*Brady*." *Id*.

79

When asked by the government to provide case law supporting the propositions that the material from the attorney proffers was both admissible and discoverable, Mr. Saffarinia cited *United States v. Blankenship*, No. 5:14-CR-00244, 2015 WL 3687864, at *7 (S.D. W. Va. June 12, 2015), in which the court found that attorney proffers fall under *Brady*. *Id.* The government responded that *Blankenship* was "anomalous and distinguishable," and that it had already provided Mr. Saffarinia with searchable indices containing information regarding that topic. Def.'s Ex. 4, ECF No. 28-6 at 2. Thereafter, the government confirmed in its opposition brief that the "MOIs and 302s relating to attorney proffers have already been produced" in the voluminous discovery. Gov't's Opp'n, ECF No. 29 at 10.

### 3.    The Use of Open-File Discovery

The Supreme Court has "recognize[d] that [the use of an open file policy] may increase the efficiency and the fairness of the criminal process," *Strickler*, 527 U.S. at 283 n.23, but the Supreme Court has "never held that the Constitution demands an open file policy," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "[O]pen-file discovery does not relieve the government of its *Brady* obligations." *United States v. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998) (Friedman, J.); *see also Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 828 (10th Cir. 1995) ("While an 'open file' policy may suffice to discharge the

prosecution's *Brady* obligations in a particular case, it often
will not be dispositive of the issue.").

Depending on the facts and circumstances of a case, "it
[may be] appropriate to require the government to identify the
*Brady* material in the discovery that has been produced." *United
States v. Cutting*, No. 14-CR-00139-SI-1, 2017 WL 132403, at *9
(N.D. Cal. Jan. 12, 2017); *see also United States v.
Rubin/Chambers, Dunhill Ins. Servs*., 825 F. Supp. 2d 451, 454
(S.D.N.Y. 2011) ("In certain circumstances and acting under
their discretionary authority to manage the cases before them,
some courts have required prosecutors to identify *Brady* material
contained in a previously disclosed but 'voluminous' production
of documents and data.").[15] "[T]he Government cannot hide *Brady*
material as an exculpatory needle in a haystack of discovery
materials." *United States v. Thomas*, 981 F. Supp. 2d 229, 239
(S.D.N.Y. 2013) (citing *Skilling*, 554 F.3d at 577); *cf. United*

---

[15] Persuasive authority has articulated a "general rule" that
"the government is under no duty to direct a defendant to
exculpatory evidence within a larger mass of disclosed
evidence." *United States v. Skilling*, 554 F.3d 529, 576 (5th
Cir. 2009), *aff'd in part, vacated in part, remanded*, 561 U.S.
358 (2010); *see also Dukes v. Pappas*, 405 F. App'x 666, 669 (3d
Cir. 2010) ("*Brady* does not require the government 'to
facilitate the compilation of exculpatory material that, with
some industry, defense counsel could marshal on their own.").
"However, that case law does not preclude the [Court] as a
matter of case management (and fairness) in ordering
identification [of *Brady* material] to be done." *United States v.
Salyer*, No. CR. S-10-0061 LKK (GGH), 2010 WL 3036444, at *2
(E.D. Cal. Aug. 2, 2010).

*States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided . . . .").

In this case, it is undisputed that there are voluminous case files, *see* Def.'s Ex. 1, ECF No. 28-3 at 2, and the government has provided Mr. Saffarinia with millions of pages of documents, *see* Gov't's Opp'n, ECF No. 29 at 3, 10. Mr. Saffarinia argues that the government's obligations under *Brady* require it to identify any known *Brady* material, "where it has produced 3.5 million pages of documents and *nowhere* identified the location of *Brady* material within that massive production." Def.'s Brady Mem., ECF No. 28-1 at 7 (emphasis added). Mr. Saffarinia relies on *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), in which Judge Paul L. Friedman ordered that "[t]o the extent that the government knows of any documents or statements that constitute *Brady* material, it must identify that material to [the defendant]," *id*. at 29-30. In reaching that decision, Judge Friedman explained that "[t]he government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack." *Id*. at 29.

In *Hsia*, the defendant was indicted on various criminal charges arising from a scheme to solicit illegal political contributions through straw donors. 24 F. Supp. 2d at 19-20. The defendant claimed that she "received literally no *Brady* material from the government and maintain[ed] that it [was] virtually impossible that there would be no *Brady* material in a case involving an in-depth investigation of [that] magnitude with presumably extensive grand jury testimony, FBI interviews, and testimony and interviews on Capitol Hill." *Id*. at 29. The defendant argued that it "was literally impossible for her counsel to cull through the 600,000 documents and identify the potentially relevant documents from [that] mass of paper." *Id.* at 28. The government responded by providing the defendant with "three notebooks of information that it claim[ed] contain[ed] the relevant documents." *Id*. Judge Friedman shared the defendant's "skepticism" about whether the government understood its *Brady* obligations, *id*. at 29, and "accept[ed] the government's representation that it will immediately disclose any and all *Brady* material that it has, or discovers that it has, in its possession," *id*. at 30.

Here, the Court agrees with Mr. Saffarinia that the government's *Brady* obligations require it to identify any known *Brady* material to the extent that the government knows of any such material in its production of approximately 3.5 million

pages of documents. *See* Def.'s Brady Mem., ECF No. 28-1 at 7; *see also* Def.'s Reply, ECF No. 37 at 4. The government attempts to distinguish *Hsia* from this case. *See* Gov't's Opp'n, ECF No. 29 at 6. First, the government argues that Judge Friedman's order to the government in *Hsia* to identify *Brady* material within its open-file discovery, "*to the extent that it knew of any* such documents or statements," did not require the government to "sift through the evidence in search of anything that could help the defense, as is requested here." *Id.* (citing *Hsia*, 24 F. Supp. 2d at 29). But the Court agrees with Mr. Saffarinia that he "simply asks the government to identify *Brady* material **already known to it** based on its **existing knowledge** of the documents it collected and reviewed in the first instance." Def.'s Reply, ECF No. 37 at 3. Indeed, one of Judge Friedman's "several basic propositions of *Brady* jurisprudence" and "general warnings" includes "it is the government's responsibility in the first instance to determine whether information in its possession is *Brady* material." *Hsia*, 24 F. Supp. 2d at 30.

Next, the government contends that *Hsia* "held that 'it is not the court's role to referee . . . disagreements about materiality and supervise the exchange of information.'" Gov't's Opp'n, ECF No. 29 at 6 (quoting *United States v. McVeigh*, 954 F.

Supp. 1441, 1451 (D. Colo. 1997)).[16] In making that observation, Judge Friedman accepted the government's representation that it would disclose all *Brady* material in its possession. *Hsia*, 24 F. Supp. 2d at 30. Nine years later, however, Judge Friedman could "no longer endorse [that] view" after later discovering that the government's view of *Brady* and the court's view were inconsistent for many years. *United States v. Naegele*, 468 F. Supp. 2d 150, 152 n.2 (D.D.C. 2007) (Friedman, J.). Judge Friedman noted that the court "no longer accepts conclusory assertions by [DOJ] that it 'understands' its *Brady* obligations and 'will comply' or 'has complied' with them." *Id.*

Mr. Saffarinia correctly points out that other courts have adopted the approach taken in *Hsia*. *See* Def.'s Brady Mem., ECF No. 28-1 at 7. In *United States v. Blankenship*, No. 5:14-CR-00244, 2015 WL 3687864, *3 (S.D. W. Va. June 12, 2015), the defendant sought an order compelling the government to identify in its discovery production, *inter alia*, all *Brady* material. The defendant argued that the government was "hiding" exculpatory evidence in "four million pages of discovery," and that the

---

[16] Consistent with *Hsia*, the court in *McVeigh* made clear that prosecutors "must inform themselves about *everything* that is known in *all of the archives* and *all of the data banks of all of the agencies* collecting information" and "disclose that which may be exculpatory under the materiality standard of *Kyles*" regardless of the government's burden objections. *McVeigh*, 954 F. Supp. at 1450 (emphasis added)).

"unorganized production" resulted in prejudice because the defendant would not have had time to review the massive production before trial. *Id.* The government responded that: (1) *Brady* does not "require the [government] to do the job traditionally performed by defense counsel"; (2) the government fulfilled its *Brady* obligations by providing the defense with "a searchable, indexed, digital database of documents"; and (3) the database was "capable of electronic search and [was] rich with metadata and indexed by a variety of different characteristics that allow[ed] Defendant to search, sort, and categorize them however he please[d]." *Id.* at *4 (citation and internal quotation marks omitted). The court disagreed. *Id.* at *8.

The court in *Blankenship* found that "the [government] should specifically designate any known *Brady* material as such and disclose the same to defense counsel." *Id.* at *6. The court also found that "the [government] does not comply with the requirement of *Brady* by merely including all known *Brady* material within the four million plus pages of discovery." *Id.* The court observed that "the [government], having determined the nature of the charges and having knowledge of the evidence and witnesses it intends to produce to prove those charges, is in a far better position than the [d]efendant to know what evidence might be exculpatory and/or impeachment material under *Brady*." *Id.* at *7.

In this case, the government does not deny that the court in *Blankenship* "did order the government to identify *Brady* material separately," but the government argues that *Blankenship* is distinguishable from this case because "the defense claimed that a large portion of the voluminous discovery was disorganized and unsearchable, it did not receive certain categories of documents, and it claimed the government was burying exculpatory evidence with an imminent trial date looming." Gov't's Opp'n, ECF No. 29 at 6. Those distinctions are inconsequential. The government does not address the *Blankenship* Court's rejection of the the government's argument that merely providing a "searchable, indexed, digital database of documents" to the defendant was sufficient under *Brady*. *Blankenship*, 2015 WL 3687864, at *4; *see also* Def.'s Reply, ECF No. 37 at 4.

To support his position, Mr. Saffarinia cites *United States v. Salyer*, No. CR. S-10-0061, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010). *See* Def.'s Brady Mem., ECF No. 28-1 at 7. *Salyer*, a decision left unaddressed by the government, *see* Gov't's Opp'n, ECF No. 29 at 1-11, is persuasive. In that case, the court directed the government to identify previously-disclosed *Brady/Giglio* material to the defendant where the government collected documentary information during a five-year investigation, and the government's massive production consisted of electronic information with multiple gigabytes and millions

of pages. *Salyer*, 2010 WL 3036444, at *1, *3. The court reached that conclusion based on the circumstances of that case, which included: (1) there was a "singular, individual defendant, who [was] detained in jail pending trial, and who [was] represented by a relatively small defense team[;]" and (2) "[t]here [was] no parallel civil litigation, and [the defendant] [did] not have access to voluntary corporate assistance in attempting to find the documents needed by the defense." *Id*. at *7.

The court in *Salyer* rejected the government's argument that it would have been a burden to identify *Brady/Giglio* information in the voluminous production. *Id*. at *3-*5. The court noted that "[d]uring the course of the years long investigation . . ., the government personnel seemed to be able to segregate that evidence which would be useful in the prosecution in terms of guilt, but apparently made no efforts to segregate that evidence which runs counter to the charges." *Id*. at *4. The court explained that "[i]f the government professes [the] inability to identify the required information after five *years* of pre-indictment investigation, its argument that the defense can 'easily' identify the materials buried within the mass of documents within *months* of post-indictment activity is meritless." *Id*. at *5. The court observed that "the Supreme Court has placed the initial *Brady/Giglio* duty on the government, and the [court] is not free to assign it to [the

defendant],"  *id*., and "the duty of the defendant to exercise
diligence does not negate the duties of the prosecution in the
first instance to affirmatively look for and disclose
*Brady/Giglio*," *id*. at *5 n.6.

As the present case closely resembles *Salyer*, the Court
reaches the same outcome. Like the defendant in *Salyer*,
Mr. Saffarinia is an individual defendant who neither has the
benefit of parallel civil litigation, nor access to voluntary
corporate assistance to sift through the massive amounts of
documents within the government's voluminous production. *See*
Def.'s Brady Mem., ECF No. 28-1 at 10-11. The defendant in
*Salyer* was represented by "a relatively small defense team,"
*Salyer*, 2010 WL 3036444, at *7, and Mr. Saffarinia's "counsel is
handling this matter *pro bono*" with "time constraints" and
"limited financial resources," Def.'s Brady Mem., ECF No. 28-1
at 10. As in *Salyer* where the prosecutors and government
personnel collected and reviewed the voluminous documentary
information over the course of a five-year investigation, *see*
*Salyer*, 2010 WL 3036444, at *3-*5, Mr. Saffarinia points out—and
the government does not dispute—that "the government—assisted by
at least two federal prosecutors and several federal agents from
at least two law enforcement agencies—has had the luxury of
reviewing this material on a rolling basis over the course of
its three-year investigation," Def.'s Brady Mem., ECF No. 28-1

at 10. Thus, the government's argument—that it does not have an independent obligation to "comb through the discovery to identify materials that [Mr. Saffarinia] may find valuable in building his case," Gov't's Opp'n, ECF No. 29 at 11, is unavailing. The government has an affirmative duty to disclose *Brady* material, it has presumably reviewed the discovery in this case, and "the prosecution knows, as any litigator would know, what evidence, on its face, significantly detracts from the factual elements which must be proven in a particular case." *Salyer*, 2010 WL 3036444, at *5.

Both parties rely on the Fifth Circuit's decision in *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009), *see* Def.'s Brady Mem., ECF No. 28-1 at 7-8, 10; *see also* Gov't's Opp'n, ECF No. 29 at 6-8, but the Court finds the reasoning in *Skilling* unpersuasive. In that case, the defendant, Enron's former chief executive officer ("CEO"), argued that the government suppressed *Brady* evidence because it never directed him to a single *Brady* document in the open file. *Skilling*, 554 F.3d at 576. The defendant asserted that he could not have reviewed several hundred million pages of documents in the government's voluminous production to find all of the exculpatory and potentially exculpatory information. *Id.* The Fifth Circuit rejected the defendant's argument that "the government's use of an open file to satisfy its *Brady* disclosure

obligation was legally insufficient." *Id*. at 574.

The Fifth Circuit held that the government did not violate *Brady* by providing the defendant with access to its voluminous open file for four reasons: (1) "[t]he open file was electronic and searchable"; (2) "[t]he government produced a set of 'hot documents' that it thought were important to its case or were potentially relevant to [the defendant's] defense"; (3) "[t]he government created indices to these and other documents"; and (4) "[t]he government also provided [the defendant] with access to various databases concerning prior Enron litigation." *Id*. at 577. The Fifth Circuit determined that the government was not required to "scour[] the open file in search of exculpatory information" because "the government was in no better position to locate any potentially exculpatory evidence than was [the defendant]." *Id*. The Fifth Circuit reached this outcome by explaining that the government's "additional steps" went "beyond merely providing [the defendant] with the open file," the defendant had "equal access" to the open file, the case was complex, and there was no evidence that the government hid exculpatory information in bad faith. *Id*. The Fifth Circuit, however, "[did] not hold that the use of a voluminous open file can never violate *Brady*." *Id*.

The Fifth Circuit laid out three scenarios where the government's use of a voluminous open file could constitute bad-

faith suppression of exculpatory evidence in violation of *Brady*:

(1) "evidence that the government 'padded' an open file with pointless or superfluous information to frustrate a defendant's review of the file might raise serious *Brady* issues";

(2) "[c]reating a voluminous file that is unduly onerous to access"; and (3) "hid[ing] *Brady* material of which [the government] is actually aware in a huge open file in the hope that the defendant will never find it." *Id*.

*Skilling* is distinguishable from this case because the government in that case provided Enron's former CEO with "access to various databases concerning *prior Enron litigation*," *Skilling*, 554 F.3d at 577 (emphasis added), whereas Mr. Saffarinia does not have the advantage of information and documents from prior litigation or parallel civil litigation, *see* Def.'s Brady Mem., ECF No. 28-1 at 8. Furthermore, the government in *Skilling* "produced a set of 'hot documents' that it thought were important to its case or were potentially relevant to [the defendant's] defense," *Skilling*, 554 F.3d at 577, but the government in this case "provided [Mr. Saffarinia] with a large binder of 'hot documents' used during a *reverse proffer session* that outline[d] the government's case," Gov't's Opp'n, ECF No. 29 at 7 (emphasis added). Although the government "discussed with the defense both the inculpatory material and the possible legal and evidentiary weaknesses in the

government's case" against Mr. Saffarinia during two reverse proffer sessions, *id.*, Mr. Saffarinia notes—and the government does not dispute—that "the government has never suggested the binder contains **all** the material, exculpatory information within the government's files," Def.'s Brady Mem., ECF No. 28-1 at 5 n.2.

Putting aside the "hot documents" binder and the absence of prior litigation, the reasoning in *Skilling* is inconsistent with guidance from the Supreme Court and the D.C. Circuit. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 110, 96 S. Ct. 2392, 2401 n.17 (1976) (noting that the Supreme Court has "expressly rejected the good faith or the bad faith of the prosecutor as the controlling consideration"); *United States v. Pasha*, 797 F.3d 1122, 1141 (D.C. Cir. 2015) ("There is . . . no way around the fact that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" (quoting *Brady*, 373 U.S. at 87)). "Thus, if there is a non-disclosure occasioned by the massiveness of the document production to which the defense is given access, it should make no difference whether such was accompanied by good or bad faith—a non-disclosure is a non-disclosure no matter what the motivation." *Salyer*, 2010 WL 3036444, at *7.

Suppression by the prosecution of exculpatory evidence violates *Brady* "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. For that reason, the non-binding, out-of-Circuit authorities relied upon by the government are not persuasive. *See, e.g.*, *United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) (finding no *Brady* violation "absent some showing that the government acted in bad faith or used the file to obscure exculpatory material"); *United States v. Richards*, 659 F.3d 527, 545 (6th Cir. 2011) (finding "no abuse of discretion in the district court's denial of [defendant's] motion to compel identification of evidence under Rule 16" where there was no evidence that the government acted in bad faith); *United States v. Warshak*, 631 F.3d 266, 297-98 (6th Cir. 2010) (holding that "the government did not engage in any conduct indicating that it performed its *Brady* obligations in bad faith" and "there [was] no indication that the government deliberately concealed any exculpatory evidence in the information it turned over to the defense"); *Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d at 455 (finding that "there [was] no allegation of prosecutorial bad faith or that the Government ha[d] deliberately hid what it knowingly identified as *Brady* needles in the evidentiary haystacks of its disclosures to Defendants"); *United States v. Ohle*, No. S3 08 CR 1109 JSR, 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011) (finding "there

[was] no evidence of bad faith that ha[d] been proffered in [that] case"), *aff'd*, 441 F. App'x 798 (2d Cir. 2011).[17]

Under the circumstances of this case, this Court adopts the approach taken in *Hsia* and other decisions, as discussed above, directing the government to identify exculpatory information within its voluminous production. This Court exercises its discretion, in the interest of fundamental fairness and as a matter of case management, to grant Mr. Saffarinia's request that the government specifically identify any known *Brady* material contained in its previously-disclosed production of approximately 3.5 million pages of documents.

### 4. Attorney Proffers

Finally, Mr. Saffarinia argues that "[t]he government appears to misunderstand its *Brady* obligations" because the

---

[17] The Court observes that the government relies on other cases involving voluminous case files that are readily distinguishable from this case. *See, e.g.*, *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (holding that the government did not suppress *Brady* material where a private company had records relevant to the case, but the private company was not part of the prosecutorial team and the defense had access to the private company's records); *Dukes*, 405 F. App'x at 669 (holding that *Brady* does not require the government to provide defendant with government's "more convenient" spreadsheet of financial transactions); *United States v. W. R. Grace*, 401 F. Supp. 2d 1069, 1080-81 (D. Mont. 2005) (individual defendants and corporate defendant had access to relevant documents from a parallel civil litigation and "there [was] every reason to expect that the individual Defendants [would] have [had] access to and benefit[ted] from [the corporation's] institutional understanding of its own documents").

government requested from defense counsel case law supporting the proposition that "information proffered by a defense attorney is both discoverable and admissible." Def.'s Brady Mem., ECF No. 28-1 at 11; *see also* Def.'s Ex. 4, ECF No. 28-6 at 2. Disagreeing with Mr. Saffarinia's description of the government's position and legal obligations regarding this topic, the government contends that Mr. Saffarinia's request for attorney proffer materials is moot because the government instructed defense counsel to review the production logs that contain certain information regarding the attorney proffers. Gov't's Opp'n, ECF No. 29 at 10. Mr. Saffarinia argues that his request is not moot because the government has failed to produce all of the attorney proffer materials. *See* Def.'s Reply, ECF No. 37 at 8-9.

According to Mr. Saffarinia, the government's "demand that *Brady* [material] be 'admissible' is a standard wholly of its own invention." Def.'s Brady Mem., ECF No. 28-1 at 13. Indeed, "items may still be material and favorable under *Brady* if not admissible themselves so long as they 'could lead to admissible evidence.'" *United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012) (quoting *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *see also United States v. Sitzmann*, 74 F. Supp. 3d 128, 135 (D.D.C. 2014) (observing that *Brady* evidence "includes favorable evidence that is itself admissible, or which could be

used to impeach a prosecution witness"), *aff'd*, 893 F.3d 811
(D.C. Cir. 2018). By not responding to Mr. Saffarinia's
argument, the government has conceded it. *See* Gov't's Opp'n, ECF
No. 29 at 10.

Neither does the government respond to Mr. Saffarinia's
contention that attorney proffer materials are discoverable. *See
id.* As an initial matter, this Court's Standing *Brady* Order
directs the government to "produce all discoverable evidence in
a readily usable form." Order, ECF No. 11 at 3. In *Blankenship*,
the court found that handwritten notes and attorney proffers
fell under *Brady*, and "the *substance* of the same should, of
course, be produced." 2015 WL 3687864, at *7; *see also United
States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 162 (2d Cir.
2008) ("By suppressing [FBI agent's] notes of [a] proffer, the
government deprived [defendant] of exculpatory evidence going to
the core of its bribery case against him."). Mr. Saffarinia
relies on the United States Attorney's Manual that "outlines
'where to look' and 'what to review' in order to meet the
government's *Brady* obligations." Def.'s Brady Mem., ECF No. 28-1
at 13 n.3 (quoting U.S.A.M. § 9-5.002). According to
Mr. Saffarinia, the United States Attorney's Manual "directs
that 'prosecutors [should review agency files for testifying
witnesses] . . . for discoverable information' which 'includ[es]
***all proffer, immunity and other agreements***.'" *Id.* (quoting

U.S.A.M. § 9-5.002). By not responding to Mr. Saffarinia's argument, the government has conceded that attorney proffer materials are discoverable. *See* Gov't's Opp'n, ECF No. 29 at 10.

The Court agrees with Mr. Saffarinia that the issue of attorney proffer materials is not moot. *See* Def.'s Reply, ECF No. 37 at 8; *see also* Gov't's Opp'n, ECF No. 29 at 10. In response to Mr. Saffarinia's request for the attorney proffer materials, "[t]he government instructed defense counsel to review the detailed discovery logs because those logs reflect that MOIs and 302s relating to attorney proffers have already been produced." Gov't's Opp'n, ECF No. 29 at 10. In its opposition brief, the government identified attorney proffer statements for Person A, but the government did not identify attorney proffer statements for other individuals, such as counsel for Person B, Company B, and Company B's employees. Def.'s Reply, ECF No. 37 at 8. Mr. Saffarinia notes that the interview memoranda and FD-302s include references to counsel for Person B, Company B, and Company B's employees. *Id*. The Court therefore finds that Mr. Saffarinia's request for attorney proffer materials is not moot.

\*    \*    \*

Upon careful consideration of the facts and circumstances of this case, the Court directs the government to identify the *Brady* material, including the attorney proffer materials, within

its production. The Court declines to order the government to disclose whether it possesses *Brady* material for each category of the requested information and whether it has conducted a review for *Brady* information. *See Hsia*, 24 F. Supp. 2d at 30 ("[I]t is the government's responsibility in the first instance to determine whether information in its possession is *Brady* material."). Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Mr. Saffarinia's *Brady* motion.

## IV.    Conclusion

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Mr. Saffarinia's Motion to Dismiss, the Court **DISMISSES WITHOUT PREJUDICE** Count I of the Indictment, and **GRANTS IN PART** and **DENIES IN PART** Mr. Saffarinia's Motion for *Brady* Material. The government shall identify any known exculpatory information within its production and file a notice of compliance on the public docket by no later than forty-five (45) days from the date of this Memorandum Opinion. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**United States District Judge**
**January 15, 2020**